**JURY TRIAL DEMANDED**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------X

EATONI ERGONOMICS, INC.,                        Civil Action No.
                                                08 Civ.  10079 (WHP)
                          Plaintiff,

  - against -

RESEARCH IN MOTION CORP.  and
RESEARCH IN MOTION LIMITED,

                          Defendants.           **AMENDED COMPLAINT**
-----------------------------------------X

    Plaintiff Eatoni Ergonomics, Inc., by its attorneys Berry Law PLLC, for its Amended

Complaint alleges as follows:

**I.  PARTIES**

    1.  Plaintiff Eatoni Ergonomics, Inc. ("Eatoni") is a corporation organized under the laws

of Delaware and has a principal place of business in New York, New York.  Eatoni is a citizen of

the State of New York within the meaning of 28 U.S.C. §1332(a), and a resident and domiciliary

of New York.

    2.   Defendant Research in Motion Corp. is a corporation organized under the laws of the

State of Delaware and has a principal place of business in Irving, Texas.  Research in Motion

Corp. is a citizen of the State of Texas within the meaning of 28 U.S.C. §1332(a), and a resident

and domiciliary of Texas.

    3.   Defendant Research in Motion Limited is a corporation organized under the laws of

the province of Ontario, Canada and has a principal place of business in Ontario, Canada.

Research in Motion Limited is the subject of a foreign country within the meaning of

§§1332(a)(2) and (3), and a resident and domiciliary of Canada.  On information and belief,

Research in Motion Corp. is either owned by or affiliated with Research in Motion Limited and

is the United States sales and marketing representative for Research in Motion Limited.   (The

defendants will be referred to jointly as "RIM" and verbs describing RIM's conduct will be in

the singular form, despite the fact the defined term "RIM" describes two corporations.)

## II.   JURISDICTION, VENUE and INTERSTATE COMMERCE

4.   *In personam* jurisdiction exists over defendants because they are present, and doing

and transacting business within the State of New York.

5.   Federal subject matter jurisdiction exists pursuant to Section 4 of the Sherman Act, 15

U.S.C. §4 and 28 U.S.C. §§1331, 1337 and 1338.  Federal subject matter jurisdiction also exists

under 28 U.S.C. §§1332(a)(1),(2) and (3) because complete diversity of citizenship exists among

adverse parties.

6.   The Court has supplemental jurisdiction over the state law claim asserted in this action

pursuant to 28 U.S.C. §1367.  The federal law claims and state law claim all arise from a

common nucleus of operative facts.

7.   RIM's anti-competitive conduct in violation of Title 15 of the United States Code has

affected a substantial volume of interstate and foreign commerce, including commerce in this

District.

8.   Venue is proper in this District under §12 of the Clayton Act, 15 U.S.C. §22 and

under 28 U.S.C. §§1391(b), (c) and (d) and 1400(b).  RIM has also appointed an agent for

service of process in New York and both Research in Motion Limited and Research in Motion

Corp. are authorized to do business in New York.

2

9.   Furthermore, this action arises out of events occurring in New York, as well as testimony and admissions RIM has made in arbitration proceedings conducted in New York.

10.   Moreover, numerous persons and businesses affected by this action are located within this District.

11.   Venue is also proper within this District because Eatoni has its principal place of business here.

## III.  <u>NATURE OF THIS ACTION</u>

12.   This case concerns keypad technology for "smartphones."   "Smartphones" are mobile telephones which, at minimum, (i) send and receive email and (ii) have an operating system and thus permit the use of multiple software applications.

13.   In this action, Eatoni asserts that RIM wrongfully obtained monopoly power in several smartphone product markets and related technology markets, and abused and illegally maintained its illegal monopoly during the course of its dealings with Eatoni in violation of section 2 of the Sherman Act.  RIM's anti-competitive conduct has deprived Eatoni of at least hundreds of millions of dollars of licensing fees and other revenues and has also permanently damaged consumers by forcing the lock-in of inferior and inadequate keyboards for smartphones.

14.   Eatoni designs keyboards for handheld devices, keyboard-related software and software for "touch screen" handheld devices, such as mobile phones and pagers.  Eatoni holds United States Patent 6,885,317 ("the '317 patent"). The '317 patent discloses, *inter alia*, a series of solutions for text entry methods on hand held devices known as "reduced Qwerty technology."   Reduced Qwerty technology places more than one letter on some or all keys

3

(thereby permitting a smaller keyboard and larger individual keys) while maintaining Qwerty

ordering and letter-to-row assignments, and utilizes "disambiguation" software to predict the

user's intended content.[1]   Recently, Eatoni launched Tiny Writer Tool -- TwTool – an iPhone

application which showcases eight of Eatoni's patented and patent-pending text entry

technologies and includes numerous unique features that facilitate and enhance Twitter, the

social networking and micro-blogging service.

15.  RIM is a manufacturer of several extremely popular lines of  "smartphones" that it

sells under the trademark "BlackBerry." RIM also operates a group of "wireless email systems"

known as "BlackBerry Connect" and designs and distributes server software for email systems.

---

[1]The meaning of "ambiguous code" and "disambiguation software" can be illustrated with the following example.  Traditional telephone keypads are ambiguous methods of text entry because they assign three letters to each of the keys corresponding to numerals 2-6 and 8 and four letters to each of the keys corresponding to numerals 7 and 9, all in strict alphabetical order. Thus, on a telephone key pad, the letters A, B and C share a key assigned to the numeral "2," the letters D, E and F occupy the numeral "3" key, and so on until finally, the letters W, X, Y and Z are situated on the numeral "9" key.   On a telephone keypad, the word "FILM" would be typed by tapping the key sequence:  3-4-5-6.   The 3-4-5-6 key sequence is ambiguous since it could be deciphered not only as the word "FILM" but also as 80 other four-letter combinations, which are not in the dictionary of common words (*e.g.*, "FGHK", "EGLO" and "FILO") and were not likely intended by the writer.  Disambiguation software is sometimes referred to as "predictive text" software.  A simple form of disambiguation is performed by "dictionary-based" software.  In the telephone keypad example, dictionary-based software "predicts" that the writer intended the word "FILM" by eliminating the non-dictionary  possibilities, such as "FGHK" or "EGLO" and "FILO."  In this fashion, the dictionary-based system "disambiguates" the ambiguous code.   Ambiguous keypads sometimes generate "textonyms" or "collisions" – sets of two or more dictionary words associated with the same key sequence.   For example, on a telephone keypad, the sequence 5-4-7-7 yields all of the words "kiss," "lips" and "lisp" (as well as 141 non-word combinations).  When this occurs, dictionary-based disambiguation software not only eliminates the non-word combinations but also "predicts" that the most commonly used of the three words – "kiss" – is intended, and gives the writer the option to reject the selection of the word "kiss" and to select either "lips" or "lisp" instead. (Other types of software may attempt predictions based on context or the user's prior writing patterns.)

16.   RIM exercises and has exercised monopoly power in many of the markets involved in the mobile communications system in the United States.  For years, RIM has monopolized markets of smartphone devices designed for so-called "enterprise" users (particularly, corporate, financial and legal professionals); email systems for enterprise users; and server software for enterprise email systems.

17.  RIM has also established monopolies in the "non-enterprise" or "consumer" smartphone product markets, and in related product markets for hardware (non-touch) smartphones and in keyboard technology markets -- the markets that are the subject of this case. RIM's monopolies in these consumer and hardware smartphone markets and the related technology markets were not achieved and maintained by reason of RIM's skill, foresight or industry.   Instead, RIM's dominance in these markets was achieved and/or maintained because of its infringement of Eatoni's '317 patent and, thereafter, maintained by means of RIM's sham and deceptive conduct toward Eatoni and, finally, maintained by RIM's refusal to deal with Eatoni.

18.  Section 2 of  the Sherman Act is violated when a monopoly is obtained or maintained by means of a "independent" business tort -- *i.e.*, a business tort that exists independently of antitrust law.  RIM's infringement of the '317 patent is a statutory business tort.  RIM's conduct following the patent infringement -- its admitted deception of Eatoni and refusal to deal with Eatoni – also violatedsection 2 of the Sherman Act,  First, that conduct subverted hugely beneficial keyboard innovations.  Second, the conduct was motivated, as RIM officer Carlo Chiarello has testified, by RIM's desire to preserve the value of its monopolies in consumer and hardware smartphone markets and related technologies markets.

## IV.  FACTS RELATED TO ALL ALLEGATIONS

### A.  Eatoni's '317 Patent

19.  Eatoni's president and CEO Howard Gutowitz filed the application for what became the '317 patent in 1998 and the patent was awarded in 2005.  The '317 patent discloses solutions and methods concerning text entry systems and keyboards for handheld devices, including smartphones.  Claims 28 and 42-44 concern "reduced Qwerty" keyboard technology, which is an adaptation of the "Qwerty" keyboard configuration used with most computers and, previously, typewriters.  (The term comes from keys from the sequence of letters from left to right on the top row of a standard keyboard:  Q-W-E-R-T-Y.)  As described in Eatoni's '317 patent, reduced Qwerty keyboards retain the Qwerty keyboard letter arrangement, but assign more than one letter to some keys, in order to reduce the number of columns and number of keys. For example, the letters Q, W and E may all be assigned to a single key in the upper-left corner of a reduced Qwerty keypad.   Since more than one letter character may be mapped to a key, a "reduced Qwerty" keypad generates what is known as an "ambiguous code."  The ambiguous code is interpreted by disambiguation software which predicts the intended sequence.[2]

### B.  Gutowitz' Proposal that RIM License Development Rights Under the '317 Patent

20.  In 2000, Eatoni approached RIM to see if RIM was interested in licensing development rights under the '317 patent.  At the time, RIM did not manufacture mobile phones. Instead, its principal products were the BlackBerry Inter@active Pager, a mobile emailing device, and the BlackBerry Personal Digital Assistant, another emailing device which included

---

[2]*See* footnote 1, *supra*.

contact and calendar applications (sometimes, "PDA applications").  RIM also manufactured and

sold BlackBerry Enterprise Server software, a mobile email solution.[3]  RIM showed no interest

in the '317 patent at the time.

**C.  The BlackBerry 5810**

21. In 2002 RIM released the BlackBerry 5810 which added a mobile phone, and

retained the emailing and PDA functions of the prior BlackBerry devices. The 5810 can be

considered an early "smartphone."  The 5810 used a full Qwerty keyboard because traditional

telephone keypads – whether used with disambiguation software or manipulated by the multi-tap

method – were grossly inefficient for writing email.  However, the full Qwerty keypad made the

initial BlackBerry "personal digital assistant" too wide to carry comfortably, and the size of the

device caused users to complain they felt like they were "holding a pancake to their ear."

**D.  RIM's Plans to Pursue the Consumer Smartphone Market**

22.   The initial BlackBerry smartphones were too cumbersome to be popular among

consumer (non-professional or "non-enterprise") purchasers and were used principally by

business professionals whose jobs required them to have mobile email.  However, RIM, like

other manufacturers, believed (accurately as it turned out) that smartphones could be

successfully marketed outside the "enterprise class" and that the "consumer" -- *i.e.*, non-

enterprise -- segment would demand mobile phones which could send email and receive email

and operate business and entertainment applications.  For RIM, competing in the consumer

---

[3]RIM's development and promotion of the BlackBerry Connect email systems was an
infringement of patents held by NTP, Inc. and in 2006, RIM paid $612.5 million in damages
to NTP to settle claims that BlackBerry Connect wireless email solutions had infringed the
NTP patents.

smartphone market meant reducing the size and bulk of the BlackBerry form factor,  while retaining the power and functionality associated with BlackBerry products.  (For other manufacturers, such as Motorola, Samsung and Sony-Ericsson, meeting the demand for consumer smartphone devices presented the opposite problem of adding functionality while retaining the slender and stylish form factors of their feature phones.)

23.  RIM understood that to design the smaller and narrower devices demanded in the consumer smartphone market, it would have to make the full Qwerty keyboard smaller. However, reducing the size of the device while retaining a full Qwerty keyboard required making the already tiny keys even smaller. Smaller keys, in turn, would increase the difficulty of inputting text.

**E.  RIM's Infringement of the '317 Patent**

24.  As noted, in 2000 RIM rejected Eatoni's offer to license to RIM development rights under the '317 patent.  Instead, as it turned out, RIM decided to simply infringe the '317 patent. Specifically, in 2004, RIM launched the BlackBerry 7100 Series (or Charm) device, which was an attempt to introduce smartphones to "non-enterprise" consumers.   To appeal to non-business users, RIM made the 7100 Series smaller and narrower than other BlackBerry devices, while retaining email and other non-voice functions.  RIM was able to reduce the size and width of  the form factor by utilizing a reduced Qwerty keyboard design and disambiguation software, a solution disclosed in claims 28 and 40-42 of Eatoni's '317 patent.  RIM trademarked the reduced Qwerty keyboard and software used on the 7100 Series as "SureType." SureType was a five-column, four-row keypad which assigned two letter characters to all but two of the keys on the top three rows, and also arrayed a traditional numeric keypad over the middle columns and all

four rows, *i.e.*

| ! | 1ۍ | 2 | 3 | . |
|---|---|---|---|---|
| **QW** | **ER** | **TY** | **UI** | **OP** |
| ? | 4 | 5 | 6 | ' |
| **AS** | **DF** | **GH** | **JK** | **L** |
| @ | 7 | 8 | 9 | del |
| **ZX** | **CV** | **BN** | **M** | ⇦ |
| ▲▼ | * | 0 | = # | ↵ |
| | sym | space | ▲ aA | |

25.  RIM's SureType technology was an *intentional* infringement Eatoni's then-pending patent; in fact, a RIM patent document concerning SureType directly referred to Eatoni's patent application.[4]

26.  RIM followed the Charm with a second reduced Qwerty device, known as the Pearl 7130, which was launched in 2005; the Pearl 8100 Series, which was launched in 2006; and the Pearl 9100 Series, which was launched in 2010.  Because of the narrow width and wider keys, these SureType devices were extremely popular with consumers and received favorable, though qualified, product reviews.  As detailed below, this popularity and qualified reviewer approval was achieved despite inherent flaws in the SureType design and software.

**F.  The Texas Litigation**

27.  When the '317 patent was issued in 2005, Eatoni formally requested that RIM cease and desist from infringing its rights under that patent and, instead, license those rights and pay royalties and prior damages based on the sales of the 7100 Series.  RIM responded by filing a

---

[4]http://www.patents.com/Keyboard-arrangement/US7083342/en-US/

federal declaratory judgment action – the *Research in Motion v. Eatoni* case in the United States District Court in Dallas (Civil Case No. 05 Civ. 0851 (N.D. Tex.)) -- and Eatoni counterclaimed for infringement of the '317 patent.  U.S. District Court Judge Ed Kinkeade sent the case to mediation.

**G.  RIM's Exposure on Eatoni's Infringement Claims**

28.   At the time of the mediation, Eatoni's had tremendous leverage because RIM was extremely exposed on Eatoni's infringement claim.  First, Eatoni's claim had obvious merit.  RIM has never seriously disputed that SureType keypad was a literal and obvious infringement of Claims 28 and 40-42 of the '317 patent.[5]  Second, the claim that RIM's SureType technology violated the '317 infringement claim was worth very substantial damages. RIM's infringing SureType devices had been highly popular products.  RIM's total revenues for the three fiscal years 2006-2008 period encompassing those hearings were $10.66 billion, and RIM admitted in 2007 arbitration hearings that the SureType devices then made up about one-half of its product mix.

**H.  The Mediation Term and Resulting Term Sheet**

29.   The Mediation Terms were reduced to writing on September 26, 2005.  The

---

[5]Claim 42 discloses:   An apparatus comprising [...] a keyboard [..],  an ambiguous code [...]  characterized in that it is strongly touch typable, [...] an assignment of said decoding symbols to said keys[...] that [...] satisf[ies]  [...] one constraint [...] [...] substantial conservation of [...] qwerty order [...] [...]  and said keys are arranged in at least three rows and one to ten columns, [...] wherein said [...] symbols comprise letters comprising a through z, and said three rows comprise a top row, a middle row, and a bottom row, and said keys comprise letter-assigned keys, said letters in order q, w, e, r, t, y, u, i, o and p [...] in said top row,
[...],  a, s, d, f, g, h, j, k, and l [...] in said middle row [...] in order z, x, c, v, b, n and m [...] in said bottom row, [...] wherein the number of said letter-assigned keys in each of said three rows monotonically decreases from said top row to said bottom row [...].  Tab 13, p. 82.

mediation Term Sheet ("the Term Sheet") included two mutually dependent undertakings, *i.e.*:  (i) Eatoni's commitment to license the '317 patent and dismiss its patent infringement claims; and (ii) RIM's obligation to enter into a final joint development agreement on terms that satisfied Eatoni.  The purpose of the joint development agreement, according to the Term Sheet, was to achieve "jointly-made improvements to RIM's existing SureType reduced Qwerty technology" which the Term Sheet referred to as "SureType II."

30.   The mediation term sheet also included substantive provisions which the parties intended to include in the final agreements, specifically:  (a) that RIM would "commercially deploy" the jointly developed SureType technology in its own products and (b) that an "inactivated" version of the anticipated SureType II software would be included in RIM's existing products, with Eatoni receiving the activation fees.

31.   By dismissing its claim that SureType infringed the '317 patent, Eatoni was giving up, at minimum, hundreds of millions of dollars in damages claims.  Eatoni agreed to provide this enormous consideration in the settlement *only* because of RIM's promises, in return, to jointly develop (with Eatoni) and commercially deploy the anticipated SureType II technology.

32.  Eatoni agreed to settle the case and work with RIM for several related reasons.

33. First, in certain markets, incentives toward standardization mean that little long-term competition exists between substitutable technologies; instead, the critical competition occurs in the development of new systems, frequently referred to as the "innovation markets." Contemporary antitrust law recognizes that, in the innovation markets, alternative technologies typically compete with each other only very briefly, and that the prevailing system may become not merely dominant but actually "locked in" as the standard, so that even a substantially better

11

system will not dislodge it.  (For this reason, Justice Department antitrust officials have likened the contest between standards to "a 100-yard dash.")  Once entrenched, the locked-in standard may be exceedingly difficult to dislodge because of "network effects" or "tipping" -- terms which refer to the increase in the value of system that occurs when more people use it (*e.g.*, long-distance telephone communication, Microsoft Windows, *etc*.)  Keyboarding systems are particularly susceptible to rapid and permanent lock-in, as demonstrated by the famous example of the Qwerty keyboard, which has remained the standard despite the invention of better inputting methods.

34.  Second, SureType was an inferior expression of reduced Qwerty technology and a flawed embodiment of the '317 patent.  Eatoni reasonably believed that, working jointly with RIM, it could quickly design an improved reduced Qwerty technology.  Eatoni also reasonably believed that, if the new jointly- developed technology were commercialized within the window of time remaining before the existing version of SureType became locked in, the new technology could prevail in the competition with the existing version of SureType and become the reduced Qwerty standard.  Eatoni would then be able to license the technology not only to smartphone manufacturers but also for use in many other types of electronics devices, and thus generate substantial licensing and royalty fees.

35.  Third, though RIM had infringed Eatoni's patent, RIM was uniquely capable of introducing a new reduced Qwerty technology to the market.  Given the extremely high barriers to entry in the smartphone manufacturing industry, Eatoni was of course interested in harnessing RIM's vast marketing and advertising machine in the effort to commercialize the technology which emerged from the parties' joint work.  Also, given the proclivity of inputting systems

toward rapid lock-in, working with RIM was the only practical way to remedy the illegal head

start SureType had obtained .  RIM was widely recognized as a keyboard innovator. Not only had

RIM successfully introduced SureType to the market, it had also licensed its patented full Qwerty

technology to Palm, its main competitor in the enterprise market segment.  RIM's reputation as an

innovator in keyboard technology (though undeserved to the extent it stemmed from the

infringement of Eatoni's patent) would draw substantial attention to any new jointly developed

technology.  Even by announcing that it was collaborating with Eatoni on an improved reduced

Qwerty technology, RIM would be sending a signal to consumers and product reviewers that

SureType could be much improved upon and that RIM anticipated that the technology which

would emerge from the joint work with Eatoni  would accomplish that improvement.

36.  For these reasons, if RIM and Eatoni could co-develop an improved reduced Qwerty

technology, RIM's devices would represent by far the best conceivable platform for introducing

that new keyboard to consumers and popularizing it. This is why Eatoni insisted that RIM agree

to commercialize the jointly developed technology in RIM products as a condition to Eatoni's

voluntary dismissal of its enormously valuable infringement claims.

37. If completed, the joint development venture would have also had the following

positive effects on competition and benefits for consumers:

> (a) The development of an improved reduced Qwerty technology, which
> maintained or enhanced the virtues of the existing SureType -- permitting large
> keys on a narrow form factor -- but eliminated SureType's numerous problems,
> such as too many collisions or textonyms (discussed above at p.  4 n.1),
> inadequate disambiguation software, instability of the information displayed on the
> screen while inputting and inability to perform name (or "mnemonic") dialing.
> (Name dialing refers to a business or public services numbers which are easily
> memorable:  *e.g.*, 800-GoYankees; 800-CallATT; 800-Flowers.)

> (b) Competition between the new, improved, and jointly developed

technology and the existing SureType before either became "locked in" as the reduced Qwerty standard.

(c) An opportunity for consumers to participate in the competition between the existing SureType and the new SureType II jointly developed by Eatoni and RIM by selecting one or the other.   In this manner, performance of the joint development provision would allow the version which consumers preferred to be chosen as the standard.

(d) Price competition between RIM and Eatoni in licensing rights to "SureType II" technology resulting from the Joint Development to other manufacturers.

- and -

(e)  Smartphones which were both smaller and more powerful.

**I.   RIM's Refusal to Sign Settlement Documents and, as Determined by Arbitrator Davidson, Wrongful Insistence on Having Sole Discretion to Reject Any New Joint Design And Wrongful Insistence on Limiting Work to Software Improvements**

38.   The mediation term sheet included three critical provisions concerning the joint development of the improved version of SureType.  *First:* it *expressly* provided in its 8th Bullet Point that the final joint development agreement would be determined in *future* negotiations, *i.e.*:

"The *parties agree to negotiate in good faith* on any jointly-made improvements [to SureType] and any I[ntellectual] P[roperty] related thereto." (Emphasis added.)

*Second:* the 8th Bullet Point also provided that, in the event an improvement to Sure Type were jointly developed, then RIM was *unconditionally* obligated to include that technology in RIM products, *i.e.*:

"If a SureType II is jointly developed by RIM and Eatoni, such jointly-developed SureType II *will* be pre-integrated (but inactive) in RIM products and available for customer activation without any further license requirement or payment by RIM."  (Emphasis added.)

14

*Third:* The 1st Bullet Point of the Term Sheet *expressly* made the final "joint development"

agreement a condition precedent to a "with prejudice" dismissal of Eatoni's patent infringement

claims, *i.e.*:

> "Within 5 business days of the complete execution of a final agreement, the parties agree to dismiss, with prejudice, all claims and counterclaims in the pending litigation."

Under the 1st Bullet Point, it appeared that Eatoni would not have to dismiss its patent

infringement claims until it obtained *from RIM* a joint development agreement to its liking.

39.  Eatoni and RIM did not conclude a final joint development agreement.  After five

months, negotiations broke down over two central issues.  First, Eatoni contended contended that

the mandatory language in the 8th Bullet Point of the Term Sheet -- that a "jointly developed"

SureType II "*will* be pre-integrated . . . in RIM products" -- had to be retained in the final

agreement.  In direct contradiction, RIM insisted on having "sole discretion" to refuse to deploy

the jointly-developed SureType II.  Second, Eatoni contended that the scope of the joint work

should include not only improvements in software, but also hardware (keypad) design.  Through

the next four months of negotiations, however, RIM continued to argue that the joint work would

address "software only," to the exclusion of hardware -- *i.e.*, keypads -- rejecting even the notion

that the hardware would have to be compatible with the "pre-integrated" SureType II.

**J.  The 2007 Arbitration and Award**

40.  In early 2006, Eatoni concluded that the impasse was insurmountable.  Eatoni then

invoked the arbitration provision in the Term Sheet, filed its claims with JAMS and Robert

Davidson was chosen as the arbitrator.   In this arbitration, Eatoni *first* sought an award declaring

that the Term Sheet unenforceable because it left open and did not resolve the material joint

15

development terms.  *Second,* Eatoni asserted, as an alternative to the first claim that, in the event the Term Sheet were held to be an enforceable contract, then RIM had breached that contract by violating its express obligation under the 8th Bullet Point to "negotiate in good faith" over the open joint development terms.   *Third,* Eatoni also sought declaratory relief providing that the mandatory language in the Term Sheet -- that jointly developed SureType II "will be preintegrated . . . in RIM products" -- would be retained in the final joint development terms, and that "SureType II" meant both hardware and software, each mutually compatible with the other.

41.   Following hearings, Mr. Davidson issued an Award on March 28, 2007 ("the 2007 Award").  The 2007 Award rejected Eatoni's claim to have the Term Sheet declared void. However, with respect the Eatoni's alternative claim that RIM breached the Term Sheet by refusing to negotiate in good faith, the 2007 Award appeared to make the requisite factual and legal findings to sustain Eatoni's claim.  In particular, the Award found that RIM breached the requirement in the 8th Bullet that it negotiate the open joint development terms in good faith by (1) insisting on "absolute discretion" to reject any jointly developed "SureType II" design and (2) further insisting on defining SureType II as "software only."  In particular, the 2007 Award found:

(a)   That RIM's insistence on its "unilateral discretion" and "software only" terms was: "arguably inconsistent with RIM's obligation of good faith undertaken in the eighth bullet point of the Term Sheet."

(b)   That RIM's draft joint venture terms "[M]is-described the deal in certain *material* respects" and excused Eatoni's subsequent alleged breach of a confidentiality clause.

(c)   That during the negotiations RIM failed to "perform [its] . . . joint venture obligations in accordance with the terms of the[] agreement.

- and -

16

(d) That RIM "*[b]egan* the process" -- which eventually led to the breakdown of the joint venture negotiations -- four days after the mediation by sending to Eatoni a draft "Settlement and Licensing Agreement" . . . that, in Article 7.3, defined SureType II as software only and purported to give RIM complete discretion (unencumbered by an obligation of good faith) to reject any joint design.

42.  The Award nevertheless did not address Eatoni's demand for either rescission or damages based on RIM's repudiation.

43. Instead, the 2007 Award also provided that Eatoni could insist that the joint work proceed and could also insist on a "joint development" agreement.   The 2007 Award also defined "jointly developed" to mean that "both parties believed [in good faith] the joint design to be commercially viable." *Id.*, at p. 10.  The Award further stated that, if the parties could not reach an agreement, "[t]he  Arbitrator will . . . resolve any disputes . . . including . . . disputes that may arise over the wording of any of the implementing agreements."

44. The 2007 Award further provided that, if the parties could not reach a joint development agreement themselves, Mr.  Davidson would write that agreement for them by determining "disputes over [its] wording" in a future arbitration.

45.  The 2007 Award also identified objective criteria against which a future refusal by RIM to deploy the joint design could be evaluated, *i.e.:*

"A consumer would **[1]**presumably prefer such a product [a innovative successor to SureType] (and would pay extra for it) because it would enable him or her to type a message **[2]** much faster using, perhaps, an ambiguous keyboard of unique design, while at the same time realizing a significantly **[3]** lower error rate in the translation of the keystrokes into the intended wording.
"The downside would be a **[4]** consumer's reluctance to buy, and then have to learn to use, **[5]** a non-QWERTY keyboard. . . .

46.  **[2]** Speed, **[3]** accuracy, **[4]** consumer response and **[5]** fealty to QWERTY letter arrangement are all *objectively measurable*.  Under the 2007 Award, it appears that, if a joint

design  measurably improved **[2]** "speed" and **[3]** "accuracy" and **[5]** maintained QWERTY letter ordering, it was then **[1]** presumably commercially viable unless it performed poorly in **[4]** consumer testing.

**K.  RIM's Deceptive, Misleading and Sham**
     **Condcut During the Joint Work**

   47.   Following the 2007 Award, Eatoni first attempted to negotiate a joint development agreement with RIM and then, after RIM continued to insist on having full discretion over whether to commercialize the resulting joint design, Eatoni abandoned the negotiations and decided to simply rely on RIM's obligation of commercial "good faith," as recognized by the 2007 Award.

   **(a) RIM's Misrepresentations to Eatoni About Its Actual**
        **Criteria for Any New Reduced Qwerty Technology**

   48.   At the time the joint work was commenced, Eatoni was relying on the representations that RIM had made in the 2007 arbitration hearings that its criteria for commercializing any new reduced Qwerty innovation were: (a) retaining Qwerty letter ordering, (b) increasing speed and accuracy and reducing ambiguity, (c) approximating the appearance of a traditional cell phone; and (d) maintaining a visually-centered telephone numeric keypad.

   49.   The joint work began on July 9, 2007 when Griffin met with Gutowitz  and an Eatoni engineer named Dimitrios Kechagais.  During this meeting Griffin made additional representations to Eatoni about the direction RIM believed that the joint work should take.  Specifically, at the initial July 9, 2007 meeting, Griffin introduced a concept which he referred to as a "tripod" and described as a "triple-dome key" that could be pressed in three different directions.  During this meeting Griffin and Gutowitz agreed that a keyboard based on tripods

(hereinafter, "the Tripod" or "the tripod design") could be integrated with a "chimeric" keypad which Eatoni was then working on. (Eatoni's chimeric keypad idea was aimed at merging a traditional telephone keypad and a reduced Qwerty keypad in the same design.)  They also agreed that the design resulting from the synthesis of RIM's tripod concept and Eatoni's chimeric design could achieve both RIM's goal of a centered  telephone numeric keypad and Eatoni's goal of having six columns.

50.  Also, at the July 9, 2007 meeting, it became clear that the Tripod keyboard  – as general matter – would permit a narrower form factor, but require some length.  Griffin stated that he therefore believed that the Tripod would work best with a flip form factor.  (A "flip phone" is a device with two sections which opens and closes by means of a hinge. The other two standard form factors are the "candy bar" -- the single block design RIM typically favored for BlackBerry devices -- and a "slider" -- which extends open like a slide rule.)

51.  However, RIM had never at that point in time marketed a flip form factor device, as Eatoni well knew, and Eatoni raised this concern at the July 9 meeting.  Griffin responded by assuring Eatoni that RIM planned to bring a BlackBerry flip to market if what Griffin called a "branding problem" -- the perception of flip phones as cheap devices -- could be solved.  Griffin also emphasized that 70 percent of all mobile phone users preferred the "flip" form factor.  Griffin further stated that this large market segment was, as far as RIM was concerned, "virgin territory" which RIM was anxious to exploit -- since few if any flip phones had smartphone capabilities.  Eatoni knew that if a keypad technology emerged from the joint work and was included on the first-ever BlackBerry flip, then the new keyboard design could obtain the recognition and market penetration that Eatoni had been seeking when it signed the Term Sheet.

19

52.  Eatoni disagreed with Griffin's view  that the proposed tripod  design would not work well with the "candy bar" and "slider" form factors.  However, following the initial meeting, Griffin sent Eatoni emails in which he discouraged any intention to design a tripod keyboard for candy bar or slider phone.   However, Griffin's emails simultaneously expressed great enthusiasm for a Tripod-based BlackBerry flip phone.

53.  As it turned out, every material representation that Griffin made to Eatoni about RIM's intentions and goals concerning SureType innovation was directly false and misleading.

**(i)  Griffin's False Representation to Eatoni That a Tripod
Keyboard Resulting from the Joint Work Might
Be Included on the First Ever BlackBerry Flip**

54.  Griffin's statement during the July 9, 2007 meeting that the Tripod could possibly be the keyboard selected for the first ever BlackBerry flip was a direct lie.  As of May 29, 2007, RIM had already reached an agreement with T-Mobile to use the *existing* version of SureType on the first-ever BlackBerry flip and work on this flip phone -- code-named "Kickstart" -- was already underway.   In fact, Griffin was part of the "small group" included in the early Kickstart discussions, as indicated by a June 14, 2007 RIM internal email concerning the project. Nevertheless, during the entirety of RIM's joint work with Eatoni, Griffin failed to disclose to Eatoni the agreement with T-Mobile to use the existing version of SureType (rather than any new technology) on the first-ever BlackBerry flip.  In this fashion, Griffin concealed from Eatoni that the tripod design had no possible role in any of RIM's foreseeable product lineups.   In light of the agreement with T-Mobile, Eatoni's continued efforts on the tripod design were a pointless waste of time.

55.  Had Eatoni known of RIM's agreement with T-Mobile to use the existing version of

SureType on the first ever BlackBerry flip, it would have refused to work on the Tripod or any design RIM deemed suitable for only a flip and demanded that the joint work pursue other technology, such as (a) inputting systems for a touch device or (b) a keypad suitable for the romanized Chinese language system PinYin.

### (ii) Griffin's False Representation to Eatoni that RIM Was Interested in Commercializing A Tripod Design

56.   During the July 9, 2007 meeting, and thereafter, Griffin went to great lengths to convince Eatoni that RIM was commercially interested the Tripod.  Among other statements, Griffin represented to Eatoni that RIM's CEO, Mike Lazaridis, was named as an inventor on RIM's tripod patent and that Lazaridis viewed the tripod concept as a "deep result" -- a term physicists use to describe a concept with far reaching consequences.

57.   However, Griffin's representation that RIM was interested in commercializing a tripod keyboard was a direct lie.  The defining feature of the tripod design was its multi-directional keys.  Griffin's repeated statement in emails to Eatoni that RIM was interested in the Tripod despite its view that it was  suitable for only the flip form factor was also false.  In fact, as RIM product manager Carlo Chiarello (and the person who was given the authority to either green light or reject the Tripod) testified in 2009, RIM *never* had *any* interest at all in the Tripod or any keyboard with multidirectional keys.  Chiarello further testified that RIM's *actual* criteria for SureType innovation were:  (1) *no* multi-directional keys -- that is, *no tripods*; (2) that RIM believe that it was compatible with all *three* form factors – that is, no design which RIM believed were compatible only with a flip and (3) that the new design *not* embody "too much change" from the existing SureType.  Chiarello also testified that these criteria were applicable in May 2007, before the joint work even started.

58.   Thus, Griffin's representations to Eatoni that RIM was interested in the Tripod -- a design which (1) involved multidirectional keys, (2) which, in RIM's own view, was suitable with only the flip form factor and (3) which represented an approach substantially different than that embodied in the existing SureType -- revolution rather than evolution -- was exactly the opposite of what RIM's innovation arbiter wanted.

**(b)   The Time and Resources Wasted by RIM's False and Misleading Representations Concerning its Criteria for Reduced Qwerty Innovation**

59.   At the 2007 arbitration hearings, RIM's representatives had testified that RIM's criteria included the following factors:  [1] consumer response, [2] speed, [3] accuracy and [4] fealty to QWERTY letter ordering.

60.   Relying on Griffin's representation that RIM was interested in a Tripod design for inclusion on the first-ever BlackBerry flip and RIM's representations in the 2007 arbitration hearings, Eatoni proceeded to design a Tripod keypad that met these criteria.

61.   Emails between Griffin and a software developer named Vladimir Fux dated November 21, 2007 acknowledged that a keyboard implementing the tripod design would improve speed and accuracy.   Also, tests introduced at the 2009 arbitration established that the Tripod led to extraordinary gains in accuracy and solved SureType's "instability" problem -- seemingly random partial words appearing in the display while a word is being inputted (discussed below in paragraphs 65-66).  The Tripod design adhered to QWERTY letter ordering. While RIM refused to conduct any consumer testing regarding the Tripod, market research commissioned by Eatoni and introduced in the 2009 arbitration indicated that consumers viewed the tripod design favorably.

22

62.  The tripod design thus met all of RIM's disclosed criteria for commercializing a reduced Qwerty innovation.  However, because RIM's actual criteria -- no multidirectional keys, easy adaptability across all three form factors and minimal change -- were concealed from Eatoni, the work on the Tripod was a complete waste of Eatoni's time.   In fact, Chiarello admitted in his arbitration testimony that, had he been asked, he could have informed Eatoni from the outset of the joint work that efforts at designing a tripod keyboard would have been a complete waste of time.

### (c)  RIM's Refusal To Permit Eatoni to Work on Software Design

63.  The 2007 Award held that the joint work could include either: (i) a new keypad design (hardware) and activated software, (ii) a new keypad and "inactive software"; or (iii) "software" only.   In other words, the joint work could include: *either* hardware *and* software or *software* only, but *not* hardware to the exclusion of software.  However, after the Tripod keypad (hardware) was reduced to a prototype, RIM refused to let Eatoni have access to its SureType software.  This prompted Gutowitz to protest in a November 14, 2007 email that: "Certainly it will be impossible for us to work together to improve SureType software if [Eatoni] can't even find out how RIM software performs to begin with.  * * * As scientists we work best when we have all the facts available, and I'm trying to get them."

64.  RIM never responded to Eatoni's November 14, 2007 email.   Also, RIM entirely ignored Gutowitz' email advising RIM that the "next" and "back space" functions should be on separate keys, despite the clear merit of the advice, as evidenced by the fact RIM's loading the "next" and "back space" functions on the same keys confused even Griffin.   RIM further ignored Gutowitz' efforts at advising RIM to modify the information that would be displayed while a

word is being typed – *i.e.*, yet another software improvement suggestion.  RIM thus wrongfully

excluded Eatoni from any role in software improvement efforts, again in direct contravention of

its obligations under the 2007 Award.

65.  RIM refused to permit Eatoni to work on software improvements even though RIM's

software needs were considerable at the time.  For years, frustration with SureType had caused

returns by consumers who liked the Pearl's narrowness and large keys but were frustrated by the

inaccuracy and what RIM referred to as the "instability" of SureType software.

66.  "Instability," as RIM used the term, meant the "character flipping"" that would occur

when, for example, a user was attempting to type "setting" and the display showed the following

sequence:  "a," "se," "set," "arty" -- and only if he chose to go forward after "arty,"--  "setti,"

"settin," and "setting."  RIM's initial approach to the instability problem was to attempt to

persuade the user to ignore the display.  However, consumer dissatisfaction continued, which

prompted RIM CEO Lazaridis to set an entirely different course.  He announced in an August 6,

2006 internal memo that RIM would try to reduce letter flipping via software improvement or, as

his memo put it, "fix SureType" so that the user could be encouraged to look at the display.

67.  Also, SureType disambiguation software was notoriously inaccurate.  (During the

2009 arbitration with Eatoni, Arbitrator Davidson used a Pearl device to type precisely one word -

-- "hello," an extremely common word, and got "gello," which is not even a word.)  As detailed

below, because SureType's letter-to-key assignments were very flawed, a highly accurate word

prediction would be difficult or impossible to achieve.

68.  RIM was not even close to solving these problems at the time of  the joint work with

Eatoni.  In fact, the SureType software problems were cresting in late 2007, when AT&T

informed RIM that, because of SureType-related customer returns, it would no longer include the Pearl in its lineup.  This prompted RIM Marketing executive Mike McAndrews to disseminate numerous internal emails in late 2007 and early 2008 in which he complained vehemently about SureType's performance, difficulty and reputation among consumers.  At McAndrew's behest, in early 2007 and early 2008, RIM embarked on a public relations campaign aimed at getting the public to "love" SureType.

69.  RIM's refusal to permit Eatoni to work on software improvements was hugely damaging.  Even if the joint work accomplished only an improvement in software, RIM would have been required under the Term Sheet to distribute, at minimum, an "inactivated" version of the new software design in its products, and Eatoni would have received the resulting activation fees.

### (d)  RIM's Pretexts for Terminating the Joint Work Venture

70.   RIM sent Eatoni separate letters dated January 17, 2008 and March 28, 2008 in which it stated that it had decided to terminate the joint work on the Tripod.   The March 28 letter contained bullet points of purported reasons why RIM reached this conclusion.  RIM alleges that the March 28 letter was based on conclusions reached by Chiarello, during a one hour meeting with Griffin.  However, all the purported reasons were false, pre-textual and contrary to the representations Griffin made to Eatoni during the course of the work.   For example:

> (a) The March 28 letter stated that the Tripod design did not solve the "dialing by name" or 1-800-FLOWERS problem associated with the existing version of SureType. (The existing SureType allocates the letters a keypad according to Qwerty ordering, rather than alphabetically, and thus does not allow "mnemonic" dialing, *e.g.*, 800-CALLATT, *etc*.)  This assertion was manifestly incorrect:  the Tripod did solve this problem by including a second set of less prominent letters in the alphabetic arrangement used on traditional phones, as

25

Griffin knew.

(b) The March 28 letter stated that SureType software had improved, that SureType was now seen by consumers as easy to use and that "predicting accuracy" was not important to consumers.  These statements were all false and pretextual. Eatoni knew from the first meeting with Griffin that consumer frustration with SureType had forced carriers to refund many Pearl purchases.  As demonstrated above in paragraphs 65 and 68, RIM's internal alarm over customer dissatisfaction with SureType software was actually peaking at the point in time when RIM rejected the Tripod design and terminated the joint work.  RIM's internal documents contemporaneous with the joint work reveal that RIM had concluded
that most Pearl purchasers had a 3 to 5 day learning curve before they became competent at using SureType.

(c) The March 28 letter asserted that: "Anything new in this market must be able to work effectively across different form factors, or else it just narrows the market."  If RIM required that a new design well across all form factors, it was obliged to disclose that to Eatoni at the outset of the joint work, instead of telling Eatoni the opposite: that RIM was interested in the Tripod even though, in RIM's view, it only worked well in a flip.

- and -

(d) The March 28 letter stated that: "Strong market pressures would not allow the Tripod to be adopted by RIM's carrier partners. SureType was difficult in this regard, and the carriers' hesitancy was overcome by showing its similarity to a traditional phone keypad."  This statement is an obvious pretext:  the Tripod design was far more like a traditional telephone keypad than the existing version of SureType; all carriers, including T-Mobile, were frustrated with the Pearl returns stemming from purchaser's difficulty with SureType; and T-Mobile, in particular, had been clamoring for RIM to find an innovative, "outside the box" keyboard for the Kickstart BlackBerry flip device, and only reluctantly yielded to RIM's insistence on using the existing SureType technology.

71.  When asked in a deposition about the possibility of simultaneous deployment of SureType and the Tripod technology, a scenario expressly contemplated under the mediation term sheet, Chiarello admitted that RIM's real reason for rejecting the Tripod was purely anti-competitive: *i.e.*, that such simultaneous deployment would create "market confusion" -- an obvious euphemism for competition -- and undermine RIM's "multi-year" investment in

26

SureType technology.  The desire to protect a monopoly or prevent innovation is not a

permissible motive for a monopolist's refusal to deal.


VII.   **THE CONTINUING DEFICIENCIES IN KEYBOARDS**
       **AND PARTICULAR REDUCED QWERTY TECHNOLOGY**
       **STEMMING FROM RIM'S UNLAWFUL ACQUISITION**
       **AND ABUSE OF ITS MONOPOLY POWER**

72.  SureType has inherent and structural flaws -- such as an unnecessary degree of

ambiguity and the inclusion of the two vowels ("u" and "i") on the same key -- which are the root

causes of SureType's letter flipping, inaccurate word prediction, dysfunctional word completion

and lengthy learning curve.   In fact, many of RIM's patent filings expressly acknowledge the

inadequacy of both its full Qwerty and reduced Qwerty technologies,  *e.g.*:

- Griffin, *et al.*, USPTO Patent No. 6611254: "Hand-held electronic device with a keyboard optimized for use with the thumbs";

- Griffin, USPTO Application No. 20050283724: "Predictive text dictionary population";

- Fux, Elizarov & Rubanovich, European Application No. EP1843242: "Handheld electronic device providing a learning function to facilitate correction of erroneous text entry in environment of text requiring multiple sequential actuations of the same key, and associated method";

- Hofer, Rak & Griffin, USPTO Patent D587705: "Angular Keyboard for a handheld mobile communication device";

- Rak & Roman, USPTO Application No. 20080080919: "Three row qwerty keyboard layout for compact landscape  portable handheld messaging devices";

- Fyke & Moosavi, USPTO Patent No. 7489302 "Handheld mobile communication device with flexible keys";

- Griffin & Lazaridis, USPTO Patent No. 7388576: "Handheld electronic

device and keypad providing enhanced usability and reduced size, and associated method";

●Lee, Bocking, Griffin & Fyke, USPTO Application No. 20070200734: "Lockable keyboard for a handheld communication device having a reduced alphabetic keyboard";

●Fux & Rubinovich, USPTO Application No. 20070205987: "Handheld electronic device and method for disambiguation of text input providing suppression of low probability artificial variants";

●Elizarov, Fux & Rubanovich, USPTO Application No. 20070168588: "Handheld electronic device with text disambiguation allowing dynamic expansion of input key associations";

●LaDouceur, Griffin & Fyke, USPTO Application No. 20080318617: "Appearance adaptable keypad for a handheld communication device";

●Lazaridis, USPTO Application No. 20090082043: "Color differentiating a portion of a text message shown in a listing on a handheld communication device";

●Rak, USPTO Application No. 20090115731: "Raised rail enhanced reduced keyboard upon a handheld electronic device";

- and -

●Griffin, USPTO Application No. 20090115733: "Tactile touch screen for electronic device field of technology."

73.   The foregoing patent filings disclosed the following problems, needs, challenges and

desirabilities that, if met, would improve SureType and/or RIM's reduced Qwerty products:

(a) The problem of forcing a user to "hunt for the keys he or she wishes to use."

(b) The "need for a keyboard with keys that are shaped and sized to maximize contact with the thumbs while minimizing the keyboard area required for such keys."

(c) The "need for an auxiliary input device that is to be operated by the thumb for data inputs forms and function control and that, in conjunction with the keyboard, encourages and permits data entry and management through input

performed substantially by the thumbs."

(d) The need to provide "a keyboard that is conducive to sending email messages in addition to providing a simple method to understand [the] phone keypad arrangement."

(e) The need to "provide an improved handheld electronic device with a reduced keyboard that seeks to mimic a QWERTY keyboard experience or other particular keyboard experience."

(f) The need to provide "an improved handheld electronic device [that] might also desirably be configured with enough features to enable text entry and other tasks with relative ease."

(g) The "challenge in designing a keyboard that is both easy to use and has large enough keys for a user."

(h) The need for a "device [which] would make more efficient use of the screen."

(i) The need for "software or hardware solutions . . . . to discriminate which of the several associated letters the user intends based on a particular key actuation."

(j) The need to improve the usability of a handheld electronic device as its form factor is reduced and its versatility is increased.

(k) The need "to eliminate the harmful effects of inadvertent keystrokes in portable handheld communication devices."

(l) The need "to provide an improved handheld electronic device with a reduced keyboard that seeks to mimic a QWERTY keyboard experience."

(m) The desirability of a keyboard "configured with enough features to enable text entry and other tasks with relative ease."

(n) The need for a device that "provides output in the form of a default output and a number of variants from which a user can choose . . . based largely upon the frequency, *i.e.*, the likelihood that a user intended a particular output, but also upon various features of the device [which] provide additional variants that are not based solely on frequency and rather are provided by various logic structures resident on the device."

(o) The need for "a learning function that allows the

disambiguation function to adapt to provide a customized experience
for the user."

(p) The need for "an improved handheld electronic device and an
associated method, with the handheld electronic device including a reduced
keyboard that seeks to simulate a Qwerty keyboard experience" which:
provides "a text input disambiguation function," is "responsive to an ambiguous
input [and] provides a number of proposed outputs according to relative
frequency," provides "a number of proposed outputs that can be based upon
relative frequency and/or can result from various logic structures resident on the
device," "enable[s] a custom experience by a user based upon various learning
features and other features" and "enable[s] the entry and learning of new
characters, as well as the entry and learning of new words that comprise the new
characters."

(q) The need to provide a keyboard "that is conducive to sending email
messages in addition to providing a simple to understand phone keypad
arrangement."

(r) The need to "have a keyboard configurable to have an
adaptable appearance for entering text and dialing telephone numbers."

(s) The need for "smaller devices" which are "desirable for portability."

(t) The need to "utilize the entire keyboard surface as efficiently as
possible."

- and -

(u) The need for a "user-desirable tactile feedback for positively
indicating input."

74.   Beyond the deficiencies of SureType, there is a general agreement that inputting

systems lag behind other aspects of smartphone technology and present a bottleneck which

inhibits innovation and the efficiency of mobile communication.  None of the existing

technologies are adequate.   A consensus exists that the keys are too small and close together on

both hardware and virtual (or touch screen) full Qwerty keyboards.   A similar consensus exists

that both the hardware and virtual versions of SureType have problems stemming from irrational

letter-to-key assignments and the resulting excessive ambiguity, and that software solutions cannot provide an adequate solution.

75.   Over the past decade, hundreds of patent filings concerning improved keyboard designs have been made, including dozens by RIM.  These filings reveal that many significantly improved inputting systems have already been designed, and that many more could be developed easily.  However, because of RIM's anticompetitive conduct as alleged herein, following the introduction of SureType, no hardware keyboard innovations have been commercialized, and RIM's patented full Qwerty technology and SureType remain locked in as the prevailing standards.

## VIII.  MARKET DEFINITION, STRUCTURE and MARKET POWER

### A.  The Markets in Which RIM Has Acquired or Abused Monopoly Power By Means of its Conduct Toward Eatoni

76.  RIM has wrongly acquired, abused and/or illegally maintained monopoly power in several smartphone product markets and related keypad technology markets, a demand market (monopsony) and an innovation market by means of its conduct toward Eatoni. The markets RIM monopolizes are: (i) the "Hardware Qwerty Smartphone Market"; (ii) the "Hardware Qwerty Technology Market"; (iii) the "Portrait Hardware Qwerty Smartphone Market"; (iv) the Prosumer Smartphone Market; (iv) the "Reduced Qwerty Smartphone Market"; (vi) the "Reduced Qwerty Technology Market"; (viii) the "Reduced Qwerty Technology Monopsony" and (ix) the "Reduced Qwerty Innovation Market."  These markets are defined *infra* at paragraphs 78-150.

### B.  The Geographical Scope

77.  The geographic scope for each of these markets is the United States.  This geographic market stems from the following circumstances:  (a) the Federal Communication Commission

31

must approve many of the communication devices sold in these markets, including all smartphones; (b) the United States has unique regulatory and legal requirements governing the manufacture, sale, distribution and operation of smartphones; (c) smartphone manufacturers RIM, Samsung, HTC, Motorola, Sony Ericsson, Nokia and T-Mobile all compete with each other within the United States; (d) most licensing agreements at issue in this case pertain to smartphones sold exclusively within the United States; (e) most smartphones are sold through wireless carriers whose operations are limited solely to the United States; (f) in prior antitrust cases concerning mobile phones or similar devices and wireless communications systems, the courts have found the United States to be the relevant geographic market; and (g) in much of the world Qwerty keypad technology is not needed, such as where non-Latin alphabets are used.

**C.   Market Definitions**

**(i)   The "Hardware Qwerty Smartphone Market"**

78.  The "Hardware Qwerty Smartphone" product market includes both full Qwerty and reduced Qwerty devices and excludes only (i) devices with traditional telephone keypads and (ii) devices which, like the iPhone, have *only* a touch screen virtual keyboard *to the exclusion of any hardware keyboard*.  The product market thus includes both (i) devices for which the hardware Qwerty keyboard is the only keyboard and (ii) devices which have two keyboards -- typically one hardware and one virtual -- so long as one of them is a hardware Qwerty keyboard.  Historically, the devices in this market have included:  all RIM BlackBerry products other than the Storm (a touch device) and the BlackBerry 9105 (which uses a traditional telephone keypad); the Palm Treo and Centro; the Samsung Blackjack; the Motorola Q; and all the reduced Qwerty devices from other manufacturers other than RIM, such as various devices from HTC, Samsung and

Nokia.

79.    From approximately 2001 through 2006, RIM had nearly a 100 percent monopoly of Hardware Qwerty Smartphones.  Thereafter, RIM's share of this market fell but RIM continued to maintain monopoly power.

80.  On March 28, 2008, when RIM formally terminated the joint work, RIM had monopoly power in the Hardware Qwerty Smartphone market, based on its at least 70.8 market share, which consisted of (i) its own 62.9 percent product market share and (ii) at least another 7.9 percent market share held by licensees of its hardware Qwerty keyboard technology whose market share should be attributed to RIM for purposes.  This conclusion is based on two key industry reports, and circumstances that are either indisputable or publicly acknowledged by RIM. (RIM's share of this market increased in 2009 when the BlackBerry Curve became the best-selling smartphone in the United States.)

81.  The relevant reports are a June 3, 2008 document entitled: "BlackBerry Still Trumps the iPhone in Sales,"[6] prepared by IDC which reported the consumer (non-enterprise) smartphone sales ratios for the 1st Quarter of 2008 and a report by ChangeWave Research concerning market share of enterprise (corporate) smartphone sales ratios for February 2008 and May 2008.

82.    IDC reported the following sales ratios in the consumer market for the first quarter of 2008.

| | |
|---|---|
| RIM | 44.5 percent |
| Apple | 19.2 percent |
| Palm | 13.4 percent |

---

[6]*See:*
http://www.yugatech.com/blog/anything-apple/blackberry-still-trumps-the-iphone-in-sales/
 and    http://www.wikinvest.com/concept/Smart_phone

| | |
|---|---|
| Samsung | 8.6 percent |
| HTC | 4.1 percent |
| Motorola | 2.6 percent |
| All other | 8.6 percent |

83.  ChangeWaive reported the following sales ratios in enterprise (corporate) market:

| | Feb.  2008 | May 2008 |
|---|---|---|
| RIM | 73 percent | 76 percent |
| Palm Treo (Palm's Enterprise device) | 18 percent | 17 percent |
| All other | 9 percent | 7 percent |

84.  The following additional information is indisputable or can be fairly assumed (with all doubts resolved in a manner designed to *underestimate* RIM's market share):

(a) RIM sold only hardware Qwerty devices during the 1st Quarter of 2008.

(b)  RIM's enterprise (corporate) and non-enterprise (consumer) sales were approximately equal to each other.[7]

(c) Apple sold touch-only devices exclusively during the 1st Quarter of 2008.

(d) All of the consumer market share attributed to Palm for the first Quarter of 2008 consisted of sales of the Palm Centro, rather than the Palm Treo.[8]

---

[7]  In 2008, RIM issued a press release which stated that during the last quarter of its prior fiscal years -- *i.e.*, November 1, 2007 through February 28, 2008 -- its non-enterprise (consumer) smartphone sales in North America exceeded its enterprise sales for the first time.  During the following 12 months RIM regularly reported that its enterprise and non-enterprise sales in the United States were approximately even.   Based on this information it is fair to infer that, during period January 1 through March 31, 2008, RIM's enterprise and consumer sales were approximately equal to each other. Unlike the first quarter of calendar 2008 which excludes the holiday season, the last Quarter of RIM's fiscal year included the holiday season. During the holiday season, as RIM acknowledges, relatively more consumer sales are generated than during other times of the year.

[8]  In reality, Treo sales made up a small portion of Palm's consumer market share during this period, and  the actual number of Treo sales was small, as Palm acknowledged. By  understating Palm's Treo sales in this manner, this assumption errs in favor of underestimating RIM's share of the hardware Qwerty smartphone market because.  As explained *infra*, the market share for the Treo (but not the Centro) can be included as part of RIM's market share since the Treo incorporates RIM's hardware Qwerty technology under licenses from RIM.

(e)  Samsung and HTC sold only hardware Qwerty devices during the 1st Quarter of 2008 and sold no touch devices during the Quarter.

(f)  None of the "all other" category under the consumer sales reported by IDC were for touch devices.[9]

(g)  None of "all other" consumer sales reported by IDC should be attributed to RIM's market share.[10]

85.  Application of the foregoing facts and assumptions to the data provided by IDC (1st Quarter 2008 consumer smartphones sales) and ChangeWave (February 2008 enterprise smartphone sales) yields the following shares of the entire hardware Qwerty smartphone market (*i.e.*, consumer and enterprise markets combined):

| | |
|---|---|
| RIM | 62.9  percent |
| Palm Treo | 7.9  percent |
| Palm Consumer Purchases (mostly Centro) | 9.4  percent |
| Samsung | 6.0  percent |
| HTC | 2.8  percent |
| Motorola | 1.9  percent |
| Other Consumer | 5.3 percent |
| Other Enterprise | 4.0 percent[11] |

[9] In reality, a small number were sold during this period were touch devices, *e.g.*:  the HP  IPaQ HX4700.  Underestimating the number of touch devices in the "all other" category -- and thereby overestimating the number of hardware Qwerty devices sold -- results in an understatement of RIM's market share of hardware Qwerty devices.

[10]In fact, a small portion of the device in the "all other" consumer sales category, such as the HTC Shadow, used RIM's SureType technology under licenses from RIM.  Again, the assumption  results in an understatement of RIM's market share, since products sold by the licensees of RIM's hardware Qwerty keyboard technology maybe included in RIM's market share.

[11]Since RIM's enterprise and consumer sales were approximately equal if they are both assumed to be "x." then all the remaining sales as estimate in the IDC and Changewave reports can be stated as a fraction or ration of  x.  RIM's share of both markets -- 2x -- stated as a percentage of all other sales -- 3.18x -- equals 55 percent. The percentage of combined sales for each other manufacturer -- stated as a fraction of x -- can be similarly calculated as a percentage of 3.18x.

86.  The foregoing data indicates that monopoly power based on a 70.8 market share can be attributed to RIM, because as detailed below in paragraph 104, the 7.9 percent market share for the Palm Treo should be included in RIM's market share since the Treo utilizes RIM's patented full Qwerty keyboard technology under licenses from RIM.

87.  RIM's ability to control prices in the Hardware Qwerty Keyboard Smartphone market by charging licensing fees to Palm confirm that it has monopoly power regardless of market share.

88.  "Touch-only" devices such as the iPhone and Android devices that have only a virtual keyboard fall outside the Hardware Qwerty Smartphone market and are not viewed by consumers as substitutes for hardware Qwerty smartphones for the reasons set forth immediately below:

89.  Formal studies of the mobile industry distinguish the iPhone as not merely a "smartphone" but a smartphone within a device in which multi-media functions predominate.  For example, Reading, *et al.*, "Apple iPhone," describes the early iPhone as having the following four "features":  "1.  Smart Phone" ***.  2.  Wireless Internet Communication Device ** * 3.  iPod *** 4.  PDA [defined as "appointments, calendars, contract lists, photos, emails and documents, . . ."], Computer and Camera."

90.  In fact, RIM admits that the iPhone and Hardware Qwerty Smartphones are not substitutes for each other. RIM CEO Lazaridis was quoted by cio.com in May 2008 as stating that "The iPhone and BlackBerry are two very different tools" and as characterizing the iPhone as a "multimedia machine" and the BlackBerry a business tool for "power users."

http://www.computerworlduk.com/in-depth/mobile-wireless/1405/
rim-co-ceo-lazaridis-on-the-iphone-mobile-device-management/

91.   Consumers and product reviewers also agree that the iPhone and the Android touch

screen devices, on one hand, and RIM's BlackBerry devices, on the other, inhabit different

product markets.  For example, a consumer comment to a posting by James Coopman entitled

"Android Predictions through 2013" stated:

> It is high time people recognize the focus of each "smartphone" platform:
> iPhone focuses on entertainment, Android focuses on social networking,
> BlackBerry's core is about emailing, WinMo is about having your desktop in your
> pocket. Each platform will appeal to a different market segment. I can easily see
> people leaving the iPhone for the Android, but I bet, there will be very few leaving
> BlackBerry or WinMo for Android.

http://htcpedia.com/news/Android-predictions-through-2013.html

92.  Retailers and distributors use the "hardware Qwerty" *versus* "touch" distinction as

one of the two principal bases for categorizing smartphones so that prices and features of similar

devices can be compared.  (The other is the "portrait" *versus* "landscape" distinction, which refers

to the orientation in which the device is held while inputting.)

93.  Hardware Qwerty Smartphones and touch-only devices fall into different product

markets because they have different core functions and different segments of the consumer

markets as end users.

94. The popularity of the RIM (and to a lesser extent, Palm) hardware Qwerty devices has

largely stemmed from their ability to facilitate efficient email communication.   Hardware Qwerty

Smartphones are considered vastly better than touch devices for text entry:  they have as their

core function efficient sending and receipt of email and are purchased by consumers whose main

concern is efficient email communication.  By contrast, because of their large screens, the core

function of touch-only devices is their multimedia capabilities.

95.   The superiority of hardware Qwerty devices over touch devices for text entry is generally agreed upon.  For example, a formal study by User Centric, entitled *Early Adopter iPhone User Study Identifies Baseline Issues with iPhone Interface*, found:  "Participants *uniformly* found text entry SMS and email to be difficult. They were frustrated by the forced use the vertical keyboard and the lack of visibility for editing the middle of a word or sentence. [Emphasis added.]"[12]

96.   The consensus that hardware Qwerty smartphones are substantially superior to touch-only devices for text entry is reflected by numerous statements in internet forums and  discussion groups and the comments sections to online product reviews, such as the following:

| **Statement** | **Source** |
| --- | --- |
| The iPhone is too narrow for me to hold in a way where I can type fast and accurate with two thumbs.  I cradle it with my right hand and use a 1 thumb, 1 finger approach to typing, works real well for me. I type faster like that than with two thumbs and the phone feels more secure in my hand. | http://forums.macrumors.com/showthread.php?t=399435 |
| I just try to type as much as possible in landscape mode [of the Nexus android device]. In portrait mode the on-screen keyboard is just too narrow and the keys are far narrower than the tip of my index finger or thumb. iPhone is slightly better because the screen is slightly wider, but I still had problems with it as well. | http://forums.macrumors.com/showthread.php?t=399435 |

_____

[12]http://www.usercentric.com/news/2007/07/12/early-adopter-iphone-user-study-identifies-baseline-issues-iphone-interface

| | |
|---|---|
| A few quirks about the phone: so the standard Android keyboard is a normal mobile phone (not qwerty) in potrait mode. Lg has supplied their own lg keyboard app. The problem is that the key buttons are too narrow. My fingers are relatively slim (I'm a skinny person). Still its very hard to touch the right buttons. Maybe with a little more practice, things will get better. Landscape mode is a little bit better. | http://forum.lowyat.net/topic/1562717/+260 |
| The virtual keyboard is usable. It does work and I've banged out some emails and web forms on it. It's not as slow as I'm making it sound, but it's not as great as Apple would like us to believe it is either. Your mileage will vary. Apple suggests that after you get used to it you'll be able to type faster with two thumbs. While this may be true, I find the iPhone to be too narrow to hold and still have enough room for my two big thumbs to fit on the keyboard side-by-side. | http://www.iphone07.com/index.html |
| Push-button BlackBerry models like the Curve play well against the iPhone's most notable weakness: text entry. * * * As much as I love my iPhone, there are plenty of times that I have not responded to an e-mail in detail because of the difficulty I still have with the touchscreen. Even after two years of daily use. | http://www.pcworld.com/businesscenter/article/164399/why_blackberry_still_beats_iphone_for_some.html |
| The Apple iPhone keyboard and predictive text entry is still no match for the type of good hardware keyboard you get on a BlackBerry or Treo, but it's not unbearable. | http://review.techworld.com/phones/535/apple-iphone/ |

| | |
|---|---|
| Iphones are obviously better for apps and everything else besides business...for people that travel alot for work and have to email alot on the go (and I do mean ALOT) then hands down, blackberry is better because u can simply type 100x faster. I own both latest models of blackberry and iphone and have had both since day 1 (best of both worlds and all that jazz!) and I don't know anyone on iphone that can reply or type an email or sms as quickly (or anywhere near as quickly) as u can on a blackberry bold or curve. This is a fact.<br>Yes iphones r great for the way they look and all the apps, the camera and the fact its a form of entertainment on the go. But for those that take care of 'business' and need to respond to endless emails etc, the blackberry is your best friend! | http://www.squidoo.com/IphonevsBlackberry |

97.   RIM CEO Lazaridis acknowledges and agrees with this consensus, and has been quoted as stating that BlackBerry "power users" . . . "simply aren't satisfied with the iPhone's touch screen for text entry and that RIM customers say they cannot type as fast or as effectively on a touchscreen, and that's one big reason why the BlackBerry is a more suitable business device."[13]

98.   Different pricing and distribution channels also existed for Hardware Qwerty SmartPhones and the iPhone.   Specifically:

(a) The hardware Qwerty smartphones sold in the enterprise segment were relatively expensive -- like the BlackBerry 8700 Series and 8800 Series or the Palm Treo -- and are sold via contracts between carriers and larger businesses.  In the 1st Quarter of 2008, the iPhone did not compete with the hardware Qwerty devices sold in the enterprise market segment because corporate IT departments were not satisfied about the iPhone's security at that time.

---

[13]http://www.globalsmart.com/RIM%20co%20CEO%20Lazaridis%20on%20the%20iPhone%20Mobile%20Device%20Management.

- and -

(b) The hardware Qwerty devices sold in the consumer market in the first quarter of 2008 were relatively inexpensive:  BlackBerry Curve and Pearl sold for $149 and $99 respectively with most two-year carrier contracts and the Palm Centro sold with most carrier contracts for $69.  By contrast, in the first part of 2008, AT&T charged $499 and $599 for an iPhone (depending on memory) with a new two year contract.

99.   The large screen permitted by a virtual keyboard and the absence of any need to allocate space to hardware Qwerty keyboard means that iPhones and the Android touch-only devices are suitable for high quality multi-media applications. The pricing of the iPhone or Android Touch devices reflects the manufacturing cost of these features and the demand generated in the entertainment centric market segment for these features.

100.   For a user who mainly desires efficient email communication, an iPhone (or a touch-only Android device) is not a substitute for a hardware Qwerty smartphone.   Such a user has an incentive to switch only to another device that is either more efficient for email communication or has a better emailing efficiency-to-cost ratio.   However, the iPhone and other touch-only devices are inferior emailing devices *and* are more expensive (both in absolute terms and dramatically so in relation to their efficiency as email devices) because their pricing reflects both the manufacturer's cost of including the premium entertainment features and the demand such features generate among the consumer segment focused on mobile access to entertainment, rather than email.   Under the monopolization case law, users who are primarily concerned with efficient email communication are "more restricted" in their ability to switch to touch-only devices than are other users.  Within this group of end users, sellers of Hardware Qwerty Smartphones could profitably impose a small but significant non-transitory price increase, or have

already done so.[14]

101.  In the first quarter of 2008, the iPhone also fell into a different product market because its purchasers were (i) early adopters (since the iPhone was the first popular touch device and had many innovative features), (ii) consumers whose allegiance to the Apple brand was based not on the iPhone but, instead, on other Apple products that predated the iPhone (such as the iPod and various computer models) and (iii) who were willing to pay premium prices for the iPhone without regard to available, cheaper substitutes.  The demand inelasticity of the iPhone warrants placing the iPhone in a separate product market than the hardware Qwerty devices.

**(ii)  The Hardware Qwerty Technology Market**

102.  The Hardware Qwerty Technology Market consists of the Qwerty technologies used on hardware keypads on smartphones.  These technologies include RIM's patented full Qwerty technology, which is described below in paragraph 104, RIM's reduced Qwerty technology, SureType; and any and all other hardware Qwerty technologies (both full Qwerty and reduced Qwerty).  This market excludes traditional telephone keypads since they generally considered too inefficient for smartphones and are rarely used on smartphones.

103.  Hardware QWERTY keypad technology and the virtual keyboard technologies used on touch devices fall into distinct "technology markets" within the meaning of the case law under section 2 of the Sherman Act since virtual keyboard technologies cannot be substituted for hardware Qwerty technologies.

---

[14]Modern antitrust law acknowledges the so-called *Cellophone* fallacy: *i.e.*, that elasticity of demand should be measured at competitive, rather than monopoly prices. Therefore, actual prices should not be used if it can be shown that they already reflect monopoly power.

### (a) RIM's Patented Full Qwerty Technology

104.    The Palm Treo devices sold during the 1st Quarter of 2008 -- *i.e.*, the Treo and the

Treo 700p -- utilized RIM's patented full Qwerty technology.  On information and belief, the

Palm Treo's keyboard is licensed from RIM and embodies the inventions claimed in at least three

RIM patents.  These are:  USPTO Patent No. 6,452,588 ("the '588 Patent") which concerns "keys

that are oval or oblong in shape, and "placed at angles designed to facilitate thumb-typing";

USPTO Patent No. 6,396,482 which concerns "integrated keyboard, thumb wheel display, and

key shape and configuration"; and USPTO No. 6,278,442 which also concerns oval-shaped or

oblong keys and the angle at which they are placed.  (Together these patents will be referred to as

RIM's patented full Qwerty technology.)[15]

### (b)    RIM's licensing SureType to HTC and and Possibly Samsung and Nokia

105.  HTC includes SureType on its reduced Qwerty Smartphones, such as the HTC

---

[15]The '588 patent was issued on September 17, 2002. Immediately after the '588 patent was issued, RIM sued a competitor, HandSpring for infringing the patent in an action entitled *Research in Motion Ltd.  v. HandSpring, Inc.,* Civil Action No.  02-cv-01480-JJF (D. Del.)  The allegedly infringing devices were the HandSpring Treo 180, Treo 270 and Treo 300, which all featured oval-shaped or oblong keys positioned at an angle.  On November 5, 2002, RIM and HandSpring settled RIM's infringement claims.  The parties announced that the settlement would include HandSpring licensing several patents from RIM, presumably including the '588 patent, and paying royalties to RIM.   Based on RIM's filings with the USPTO, it appears that, in addition to the '588 patent, the other patents which HandSpring agreed to license were USPTO  Nos. 6,396,482 and 6,278,442.  USPTO No. 6,396,482 included claims concerning integrated keyboard, thumb wheel display, and key shape and configuration.  USPTO No. 6,278,442, like the '588 patent, concerned oval shaped or oblong keys and the angle at which the keys were positioned.  (Together these patents will be referred to as RIM's patented full Qwerty technology.) Shortly thereafter, Palm also agreed to license RIM's patented full Qwerty patents and pay royalties to RIM. In June 2003, Palm acquired Handspring, and assumed HandSpring's obligations under its licenses from RIM. Thereafter, Palm continued to manufacture Treo products and utilize RIM's patented full Qwerty technology on its Treo devices.  In a November 13, 2007 interview, RIM CEO Mike Lazaridis stated that: "When [Palm] launched the Treo, they licensed our keyboard."

Shadow, HTC Touch Diamond and HTC Touch Dual under a license from RIM.   On

information and belief, Samsung and Nokia also license SureType from RIM.   A September 26,

2006 internal RIM email exchange between Robert Liang to Krishna Patthiyal complains that the

Samsung 719 had infringed RIM's SureType patent and states that RIM was in licensing

discussions with Samsung.   Also, RIM and Nokia announced that Nokia received several

licenses from RIM in 2004 and that a licensing arrangement was renewed in 2008.   During this

period, Nokia's product lineup included the E55, which had a SureType-like keyboard.

(c) <strong>RIM's Market Share of Hardware Qwerty Technology</strong>

106.   Based on sales of hardware Qwerty smartphone devices, RIM had at least a 70.8

percent share of the Hardware Qwerty Technology market, as calculated based on the market

share of all products that utilized hardware Qwerty technology.   This market share includes

devices utilizing both RIM's patented full hardware Qwerty technology -- *i.e.*, the BlackBerry

Curve, BlackBerry 8700 Series and BlackBerry 8800 Series and Palm Treo -- and devices

utilizing SureType -- *i.e.*, the BlackBerry Pearl, HTC Shadow, HTC Touch Diamond, HTC

Touch Dual, Samsung 719 and Nokia E55.

**(iii)   The Portrait Qwerty Smartphone Market**

107.  From 2003 to the present, RIM has also held monopoly power in the market

consisting of smartphones with Qwerty keyboards in portrait orientation ("Portrait Qwerty

Smartphones").   Smartphone are used in "portrait" orientation (height is greater than width) or

"landscape" orientation (width is greater than height).

108.   As of March 28, 2008, the main products in the Portrait Qwerty market included

these devices:  BlackBerry Pearl 8100, BlackBerry Curve, BlackBerry 8700 and 8800 Series,

Palm Treo, Palm Centro, Samsung Blackjack, HTC Shadow and Motorola Q.

109.   On information and belief, as of March 28, 2008, RIM had a 70 percent share of the Portrait Hardware Qwerty market.  This is based on:

(i) The   and assumptions set forth above in paragraphs 81 - 84.

- and -

(ii) Reports from AdMob (which estimates the volume of internet traffic generated by various mobile phones) and Brighthand (which estimates smartphone popularity each month based on the number of views -- clicks -- each product's advertising pages receive).  These reports indicate that:  Samsung's product mix was no more than 85 percent portrait hardware Qwerty devices (the rest being landscape hardware Qwerty devices); HTC's hardware Qwerty product mix was no more than 10 percent portrait hardware Qwerty devices (the rest being landscape hardware Qwerty devices); and the sales listed in the "all other" category in IDC's report on consumer smartphone markets shares in the first quarter of 2008 were no more than 40 percent portrait hardware Qwerty (with the rest being either landscape hardware Qwerty or touch only devices).  This estimate also makes the radically conservative assumption-- that the "all other" category under ChangeWave's analysis of enterprise sales -- set forth above at paragraph 83 -- consisted solely of portrait hardware qwerty devices, which is very unlikely.  If devices sold by other manufacturers that use keyboard technology licensed from RIM -- principally the Palm Treo and the HTC Shadow -- are included as part of RIM's market share, RIM's market share is over 75 percent.  If devices, such as the Motorola Q and the Samsung Blackjack, which -- based on their utilization of the oblong or oval-shaped keys positioned at certain angles (the inventions disclosed by RIM's '588 patent) -- are similarly included in RIM's market share

(since the keyboard technology on these devices is either licensed from RIM or the result of the lock in of RIM's full Qwerty design), then RIM's share of the Portrait Hardware Qwerty devices market exceeded 90 percent as of March 28, 2008.  (RIM's share of this market increased in 2009 when the BlackBerry Curve became the best-selling smartphone in the United States.)

110. Devices with portrait hardware Qwerty keyboards and devices with landscape hardware Qwerty keyboards are in separate product markets for the following reasons:

(a)  Devices with portrait keyboards are intended to be used with one hand and consumer surveys indicate that even the wider BlackBerry portrait Qwerty devices (those popular with enterprise users) can be operated -- if not easily -- with one hand.  By contrast, two hands are needed to simultaneously hold the device and input text on devices with landscape Qwerty keyboards.

(b)  Consumers of hardware Qwerty keyboard devices are sharply divided into "pro-portrait" and "pro-landscape" camps.

(c)  Portrait hardware Qwerty devices, though they may have entertainment" functions, are not intended for and do not appeal to consumers who principally desire a mobile entertainment device, since portrait hardware Qwerty keyboards are incompatible with the large display screens required for premium entertainment features, such as video players.  Instead, portrait hardware Qwerty devices are popular with consumers who desire a phone that can be operated with one hand are designed to facilitate efficient email (and other text) communication.

(d)  By contrast, landscape hardware Qwerty keyboards are typically used on either the "slider" form factor -- on which the keyboard and the screen can be extended in opposite directions, similar to opening a slide rule -- or a "horizontal clamshell" -- a device that opens on a hinge which runs the length rather than the width of the phone.  Both sliders and horizontal clamshells are designed to permit *both* large screens *and* large Qwerty keyboards to facilitate operation of high quality interactive applications (such as video games or graphics design programs).  Because these devices have both large screens and large Qwerty keyboards, they can be very "feature rich," and there is little need to compromise features, as opposed to portrait hardware Qwerty devices which have more limited features sets and tend to include only basic business features and limited entertainment features.

- and -

46

(e)  Portrait hardware Qwerty smartphones are intended to appeal to the enterprise and "prosumer" consumer segments, which are both considered "white collar" markets.  By contrast, the sliders and horizontal clamshell devices which utilize landscape hardware Qwerty keypads are designed and marketed to appeal to consumers employed in "construction, public safety or utilities" or the military.

**(iii)   The Prosumer Smartphone Market**

111.   The "Prosumer Smartphone Market" consists of  hardware keyboard devices which:  (a) include sets of features that are designed to appeal to the demographic group or market segment known as "prosumers;" (b) have either a narrow full Qwerty or reduced Qwerty hardware keypad; (c) are used in portrait orientation; (d) are "narrow," *i.e.*, no more than 60 millimeters wide; (e) can be used easily with one hand; and (f) which do not have a touch screen or a sliding mechanism.

112.   "Prosumers," as the term is used by sociologists, social economists and market researchers (and in RIM's own market research), are individuals who, in terms of product purchases and consumption, do not draw sharp distinctions between their own professional (or "producing") and personal (or "consuming") needs.  Small business owners and self-employed white collar professionals are among the individuals who fall into the category of prosumers. RIM's market research materials -- such as a "Product Positioning Document," dated January 2007, concerning the BlackBerry Curve 8320 also classify individuals who purchase their own smartphones (as opposed to receiving one from an employer), "multi-tasking housewives" and "working women" as prosumers.

113.  As of March 28, 2008, when RIM terminated the joint work and refused to deal with Eatoni, the devices in the prosumer smartphone market were: the BlackBerry Pearl, the BlackBerry Curve, the Palm Centro, and the reduced Qwerty devices utilizing or copying

SureType, *i.e.*,  the Samsung 719, the Samsung 729, the Nokia E55, the HTC Shadow, the HTC

Touch Dual and the HTC Touch Diamond.

114.  On information and belief, as of March 28, 2008, RIM's share of the prosumer

smartphone market is in excess of 70 percent.  This estimate is supported by IDC report

described above in paragraph 81, and additional data from Ad Mob, which indicates that, out of

the RIM's 44.5 percent share of the consumer market can be further broken down as follows:

|  |  |
|---|---|
| Pearl | 21.5 percent |
| Curve | 16.8 percent |
| 8800 Series | 3.8 |
| 8700 Series | 2.4 percent |
| | |
| RIM's total share = (Consumer Market) | 44.5 percent |

115.  This breakdown of the RIM's consumer sales mix indicates that RIM has at least a

70 percent share of the prosumer smartphone market, since data from IDC and Admob indicate

that, apart from the Palm Centro, the non-RIM devices in prosumer  smartphone marked had

negligible or statistically irrelevant sales.  Since RIM has a 74 percent share of all sales

represented by the Pearl, the Curve and the Palm Centro, it undoubtedly had at least a 70 percent

share of the prosumer Smartphone market.  Also, the Samsung 719, Samsung 729, Samsung the

Nokia E55, the HTC Shadow, the HTC Touch Dual, the HTC Touch Diamond, utilize SureType

and, accordingly, the market share represented by these devices should be attributed to RIM.

(RIM's share of this market increased in 2009 when the BlackBerry Curve became the best-

selling smartphone in the United States.)

116.  Because of the size limitations of the form factor, prosumer smartphones, include

sets of features which, beyond email, represent compromises between business functions (*e.g.*,

planners, organizers and contacts) and entertainment functions.

117.  RIM sought to have the Pearl and Curve appeal to "prosumers" by designing them to approximate the appearance of traditional cell phones while retaining many of the "business" features associated with the wider BlackBerry devices and by including some entertainment features (such as a camera, or a music player) but not a full set of either business or entertainment functions.   In fact, RIM simultaneously sells several different versions of the Curve each of which offers a different combination of features, a strategy that underscores the point that narrow Qwerty smartphones must necessarily compromise on features.

118.  "Prosumer smartphones" and touch only devices fall into separate product markets for the same reasons that all hardware Qwerty devices (both the wider and the narrow devices) and touch only devices fall into separate product markets, as set forth above in paragraphs 88-101.

119.  "Prosumer Smartphones" and "landscape hardware Qwerty devices" fall into separate product markets for the reasons set forth in paragraph 110, *supra,* and for the following three additional reasons:

      (a)   While prosumer smartphones are designed to achieve "sleekness" -- an aesthetic characteristic deemed important to the prosumer (according to RIM's own research), the sliders and horizontal clamshells which utilize landscape hardware Qwerty keyboards are designed to appear "rugged."

      (b)  "Prosumer Smartphones" are intended to appeal to purchasers who prefer the appearance of traditional mobile phones, while the slider and horizontal clamshell devices which utilize landscape hardware Qwerty keyboards are intended to appeal to consumers who prefer "unique"- and "interesting"-looking devices.

      - and -

      (c)  During the 1st Quarter of 2008, prosumer smartphones were

far less expensive than the sliders and horizontal clamshell devices which utilize landscape hardware Qwerty keyboards. During the first Quarter of 2008, the BlackBerry Curve and BlackBerry Pearl was typically priced at $149 and $99 respectively (with a two year contract) and the Palm Centro priced at $69 (with a two year contract) by most wireless carriers.  By contrast, the sliders and horizontal clamshell Qwerty devices were far more expensive, *e.g.*: the HTC Mogul 6800 was typically priced at $399 with a two year contract; the Sony-Ericsson Xperia X1 retailed for $879 unlocked (sold separately from a wireless carrier contract).

120.   Prosumer smartphones, on one hand, and wider hardware Qwerty devices such as the BlackBerry 7200, 8700, 8800 and 9000 Series and the Palm Treo, on the other, fall into separate product markets because:

(a) The wider portrait Qwerty devices are intended for sale to end users who are financial, business and legal professionals -- *i.e.*, the so-called "enterprise" class who popularized the early BlackBerry smartphones, as opposed to the prosumers who were the target market for the narrow hardware Qwerty devices.

(b)  Prosumer Smartphones only include a partial set of  business features (together with a partial set of entertainment features), whereas the wider portrait  hardware Qwerty devices include a full set of business features.

(c) Prosumer Smartphones are typically purchased by the individual consumer either from his wireless carrier, an online distributor (*e.g.*, Amazon) or a traditional retail store (*e.g.*, Best Buy) whereas most wider Portrait Hardware Qwerty devices are sold to employers who purchase the device on behalf of their employees.

(d) Prosumer smartphones are typically far less expensive than wider hardware Qwerty devices.  During the first Quarter of 2008, the BlackBerry Curve and Black Berry Pearl were typically priced at $149 and $99 respectively (with a two year contract) by most wireless carriers and the Palm Centro was priced at $69.00 (with a two year contract) by most carriers.  By contrast, the wide Qwerty BlackBerry 8820 Series was priced typically priced at $349 with a two year contract and the Palm Treo priced between $299 and $599, depending on the carrier and the contract terms.

- and -

50

(e) Prosumer smartphones are designed to be *easily* operated with one hand.  By contrast, while the wider portrait  Qwerty devices are designed to permit one handed operation when necessary, for many users they are difficult to use with one hand.

**(iv)  Reduced Qwerty Hardware Smartphone Market**

121.    The reduced Qwerty Hardware Smartphone market consists of the BlackBerry Pearl and the other reduced Qwerty devices which utilize reduced Qwerty technology, *i.e.*,  the Samsung 719, Samsung 729, the Nokia E55, the HTC Shadow, the HTC Touch Dual and the HTC Touch Diamond. As of March 28, 2008, RIM had at least a 90 percent market share in the reduced QWERTY smartphone market.  If the share represented by devices utilizing SureType under a license from RIM is attributed to RIM, RIM's market share of reduced Qwerty smartphones approaches 100 percent.

122.    Reduced Qwerty devices and full Qwerty devices fall into different products markets for purposes of determining the extent of RIM's market power under §2 of the Sherman Act for the following reasons:

(a) SureType devices became popular within a different consumer market than RIM's full Qwerty devices.  RIM did not target its original consumer market – namely the financial, legal and technical professionals (whose smartphones were typically purchased by their employers) – as a market for its SureType devices, and these financial, legal and technical professionals continued to use RIM's full Qwerty devices.  RIM's target market for its SureType reduced Qwerty devices was the prosumer segment, which is defined above in 111-112. Within the prosumer market, RIM marketed its reduced Qwerty Smartphones particularly to women, choosing names such as "the Charm" and "the Pearl" which RIM believed would appeal to women and offering these devices in various colors which RIM believed would appeal to women.

As Jack Gold, a strategic analyst covering the mobile phone industry, has stated with respect to the BlackBerry, a BlackBerry full Qwerty product, that:
"[The 8800] will appeal to those users who don't like the SureType and prefer a full keyboard, like lots of corporate types that use email, and especially those that use applications – where a keyboard and bigger screen are important."
* * *

51

"[The Pearl] may take a slight hit, but I think these devices *are complementary and appeal to different users*, just like the older 8700 and 7100 did.  Those who want the smallest, lightest device will go with the current Pearl, and those who want a bigger screen and keyboard will buy the new devices. There is certainly room in the market for both.

http://searchmobilecomputing.techtarget.com/news/article/0,289142,sid40_gci1243502,00.html    (Emphasis added.)

(b)  In addition, RIM's Pearl appealed to teenagers who, since they were typically Qwerty-trained typists, were attracted to the Pearl because it maintained the narrowness and appearance of a traditional cell phone (while allowing inputting for text messaging via a Qwerty based system).  Prior to the Pearl, RIM had never attempted to market any device to teenagers.

(c) The design of the Pearl is an attempt to approximate the narrowness and appearance of a traditional mobile phone which, according to RIM's marketing research, is the design preferred by the prosumer market segment.  By contrast, the full Qwerty BlackBerry products – with the exception of the Curve – were among the widest smartphones on the market, and the Palm device popular among enterprise users  --  the Treo –  was even wider.

- and -

(d) Purchasers will pay a premium for SureType technology, as evidenced by the fact that consumers will pay more for a smartphone with a SureType keyboard than they will for a device with similar features and either a full Qwerty or traditional telephone keyboard.   For example, RIM's Pearl 7130  was more expensive than its contemporary full QWERTY counterpart, the 8703, despite the fact that apart from keypads, their features were otherwise  identical or similar and despite the fact that the group of consumers (business users) who favored the 8703 over the Pearl 7130 was demographically wealthier than the prosumers and teenagers who preferred the Pearl 7130.   This trend continued.  Simultaneous launches by carriers for the Pearl and Curve tended to price the Pearl as more expensive than the Curve.  In the spring of 2008, AT&T offered the Pearl at $149 with a two year contract and the Curve for $99 with a two year contract.  In 2009, U.S. Cellular offered the Pearl for $230 with a one-year agreement, and the Curve for $115 with a one year agreement.   In September 2010, when AT&T announced new prices simultaneously for the Pearl 3G and Curve 3G, the Pearl was priced higher at $149 with a two year contract, while the Curve was priced at $99 for a two year contract.

123.   RIM priced the Pearl significantly higher than the Curve despite the fact that the

Curve was more expensive to manufacture than the Pearl, according to RIM's January 2007

"Product Positioning Document" for the 8320 Curve. This indicates that purchasers were paying a monopoly price -- *e.g.*, $149 with a two year contract -- for the Pearl. If carriers had been charging a competitive price for the Pearl -- *e.g.*, $99 (with a two year contract) rather than the monopoly price of $149 (with a two year contract), then they could have profitably imposed a small but significant non-transitory increase in price (from the $99 competitive price) and that demand elasticity does not exist.

124.   The Pearl and the Curve also fall into separate product markets because, all else being equal, a Pearl user is more likely to switch to another reduced Qwerty device than to the Curve. Therefore, the Pearl competes with other reduced Qwerty devices, rather than with the Curve. For example, PC World heralded the HTC Touch Dual as a "good – but pricey – competitor to the BlackBerry Pearl."

125.   From an ergonomic perspective, reduced Qwerty devices appeal to consumers who find the small keys on the full Qwerty BlackBerry products difficult to use. As noted, in terms of price, styling and features, the full Qwerty BlackBerry device most similar to the Pearl is the Curve, which also is marketed to the prosumer segment. For ergonomic reasons, however, there is very little cross-elasticity of demand between the Pearl and the Curve. Specifically, the SureType keyboard allows the Pearl to use larger keys that would otherwise be permitted and therefore appeals to individuals who cannot tolerate smaller keys. By contrast, the Curve dramatically reduces the size of the individual keys in order to fit a full Qwerty keyboard on a narrow portrait device, and is popular with consumers who can tolerate very small keys. Since SureType users typically find the Curve's keys too small to operate, they are "restricted in their ability" to switch to the Curve or a similar narrow full Qwerty device. From the perspective of demand side substitutability, the Pearl (and the other reduced Qwerty devices) and the Curve

(and other narrow full Qwerty devices, such as the Palm Centro) are in separate product markets.

126.  Narrow full Qwerty devices such as the Curve and the Palm Centro also fall into a different product market from reduced Qwerty devices because some consumers simply find SureType intolerable, due to their general dislike of ambiguous keyboards, flaws in the designed of RIM's SureType keyboard or the inadequacy and errors in RIM's SureType software. Again, these users are "restricted in their ability" to switch to SureType devices and there is little if any demand-side substitutability between reduced Qwerty and full Qwerty products.

127.  The division of consumers are sharply divided into "pro-SureType" and "pro-narrow full Qwerty" camps -- and the absence of consumers who are neutral, flexible or indifferent on this issue -- is reflected by thousands of posts on internet discussion groups and forums and comment sections.  A few representative examples follow:

> I was worried about this as well and I played around in the store with the Curve considering a switch from the Pearl. To my surprise I found it easier to type on the Pearl. The Curve isn't much bigger at all and it adds a bunch of keys in order to get full Qwerty, so I found that the Curve keys actually seemed smaller and harder to hit. I ended up getting the Pearl, however I had already gotten used to typing on it when trying the Curve, so who knows, the Curve probably becomes easier after a week too. The only reason I would consider the Curve is because of the screen size, but this is personal preference.

http://http://www.blackberryforums.com/general-8100-series-discussion-pearl/126471-pearl-vs-curve-verizon.html

> I will also add that to my co-workers (I'm the BES admin) they all say the Curve is too small for their hands. They all use 8830s.

http://forums.pinstack.com/f8/pearl_or_curve-71222/index3.html

> Keyboard...full Qwerty on the Curve, shared keys on the Pearl. personal preference, neither is inherently "better" (regardless of what advocates on either side will tell you)

http://www.blackberryforums.com/general-8100-series-discussion-pearl/126471-pearl-vs-curve-verizon.html

It always comes down to personal preference. What works best for you. Its just great that RIM gives you the ability to choose. I looked at both and decided I wanted more screen and simply needed a full keyboard. I'm very happy and even more so with 4.5.0.18

http://forums.pinstack.com/f8/pearl_or_curve-71222/index2.html

I was scared at first when I ordered the Curve online, thinking that it would end up being a huge phone (my worst nightmare), but the Curve is the perfect size! Not only that, it has the full keyboard, (the Pearl only has suretype, which would get way too confusing for me) and a large screen - great for viewing attachments, menus, etc. At first I was going to order the Pearl because I liked the color, but I'm very happy I decided to go with the Curve! Best phone I've ever owned

http://www.blackberryforums.com/rants-raves-forum/149106-pearl-vs-curve-verizon.html#post1 136800

My work might foist a Blackberry on me soon. Although I use a bluetooth neckloop, sometimes I have to use the telecoil with my 8525 to talk. Will the Bold work with telecoils? I'm hoping so because I think the Curve has keys too small for my fat fingers. The Pearl is out of the question.

http://www.alldeaf.com/deaf-products-technologies/64592-blackberry-telecoils.html

Finally my thoughts on the keyboard and mouse wheel/optical pad. It took me ages to get use to the keys on the Blackberry [Curve]. The keys in my opinion are too small. My poor thumbs struggle at the best of times and I have to resort to holding the phone in one hand and using my left 2nd finger to type with my right thumb. On the Nokia E72 the keys are slightly larger and squarer and bevelled, which feel a lot easier to type on.

http://www.lookatbowen.com/2010/08/nokia-e72-vs-blackberry-curve-8900-on-looks-and-desig

I think RIM should stay with the Suretype keyboard, but I'd like to see pics of the rumored full-QWERTY for the pearl that I've heard about (but have been to lazy to search for). I think that the pearl format is too small for a true QWERTY but maybe they could pull it off. I also think that RIM should use a keyboard more along the lines of the 82XX series pearl (larger keys) but again that's just me. I don't think you could do that without making the device taller

http://forums.crackberry.com/f2/need-larger-keys-any-model-suggestions-599814/

The 9700/9780 has the same keys as the 9650, but the design makes the phone slimmer. I have a 9650 and love it!  Though, as Blade_27 said, you may be

happy with the Pearl2 (Pearl 3G) because it has big keys, but a surepress [*sic:* suretype] keyboard (2 letters per key)

128.   HTC is -- and Samsung and Nokia likely are -- paying royalties to RIM in exchange for SureType licensing rights.  On information and belief, the cost of these licensing fees is one reason HTC's SureType products have been consistently rated as overpriced by product reviewers.

129.   Existence of a loyal cadre of users who prefer SureType devices -- such as the Pearl -- to narrow full QWERTY keypads -- such as the Curve or the Palm Centro -- is reflected in the general agreement that an individual will "either love or hate" SureType technology.

130.   Similarly, RIM recognizes that the Pearl and the Curve appeal to different consumer market segments. In a May 2008 interview, Lazaridis stated that customers are walking out of mobile phone dealers "with either the (BlackBerry Curve) or a Pearl" and that for these purchasers "the keyboard" is "the defining factor."

131.   In the 2007 arbitration with Eatoni, RIM CEO Lazaridis stated that product reviews "always pick on SureType as something that's . . . 'you either like it or you don't.'" In fact, a message board "BlackBerry Forums," which is sponsored by BlackBerry distributors, has a permanent discussion topic entitled "SureType: Hate it. . . Hate it . . . Love It!"

132.   On April 28, 2011, a Google search for web pages including the word "SureType" and the phrase "love-it-or-hate-it" generated approximately 15,400 hits.  A representative sampling of these comments from online discussion groups and user forums follows:

> SureType works very well. Trying it in store may not be the best choice cause it does take a bit of getting used to. But it is very accurate and very fast–I wouldn't count it as a negative against buying the phone."
> Aha. Thanks for the correction. I've never used it, only seen it mentioned in reviews, and it seems to be a *love-it-or-hate-it* kind of thing."  (Emphasis added.)

http://forums.macrumors.com/archive/index.php/t-263054.html

       4. SURE TYPE. Face it, you *either love it or hate it*. I love typing emails and having the sure type know my words and what I am going to type. It is awesome, and truly saves time. The keys are smaller than the 7105T, but no problem.  I would imagine if you sent 100 emails a day it might get tricky. (Emphasis added.)

http://www.amazon.com/review/R7WI9J6FT6109

       For starters, the *love-it-or-hate-it* SureType keypad has been slightly reworked. Whereas the original was angular, there is a slight curve to the keys and it is now slightly larger.  (Emphasis added.)

http://www.phonearena.com/htmls/RIM-BlackBerry-Pearl-8130-Review-review-r_1880.html

       Eric,
       Since the BlackBerry 7100T came out there have been two and only two camps when it comes to SureType. Those[] *who love it and those who hate it*. I haven't found anyone who says SureType is OK.
       Personally, I like the form factor that you get with the SureType devices. I don't wear my BlackBerry on my belt, but, put it into my pocket and even though the full QWERTY keyboard Berrys are getting smaller, they still feel like a calculator in your pocket.

http://www.rimarkable.com/blackberry-pearl-2-smaller-lighter-and-takes-better-pictures-than-its-predecessor (Emphasis added.)

       Thumbs Must Hurt-2008,
       I have had my 8130 for two weeks now and I still hate sure type! I have my options/language setting to enter in multitap but most of the time I still have to go to the menu of whatever I'm using and enable multitap. That's annoying.. But nothing compared to the awful sure type

http://www.blackberryforums.com/general-8100-series-discussion-pearl/118962-suretype-hate-hate-love-2.html

      133.  The lock-in of SureType as the reduced Qwerty standard technology means that

RIM can exclude other manufacturers from competing in this product market by refusing to

license SureType to them, or by demanding prohibitive licensing fees.  RIM's ability to exclude

other potential suppliers means that little if any real cross-elasticity of supply exists and confirms

RIM's monopoly power in the Reduced Qwerty Smartphones market.

134.   Parallel product differentiation by multiple manufacturers also confirms that reduced Qwerty and narrow full Qwerty devices are in separate product markets. During 2008, HTC and Samsung gave consumers the option of purchasing a specific model in either a reduced QWERTY option or a full QWERTY option.

135.   RIM has typically introduced smartphones in pairs (sometimes referred to as "siblings" by product reviewers): *i.e.*, each reduced Qwerty model is introduced at approximately the same time as full Qwerty model having similar features and components.

136.   Thus, for RIM and other leading manufacturers, the trend is for the various smartphone models to be available in *both* reduced Qwerty *and* full Qwerty options.  The smartphone industry has thus elected to forego competition between reduced Qwerty and full Qwerty keypads for consumer purchases, and, instead, to make both these keyboard options available for their principal models.  Multiple product lines from different manufacturers is indicative of inter-brand rather than intra-brand competition and confirms that the Pearl and Curve do not compete with each other.  (Similarly, an economy car -- *e.g.*, the Ford Focus -- competes with economy cars from other manufacturers -- such as the Honda Civic --  rather than luxury lines from Ford, such as the Lincoln LS V8.)

137.   RIM's ability to control prices and exclude competition in the reduced Qwerty products market by imposing fees to license SureType is proof of monopoly power regardless of market share.

### (v) The Reduced Qwerty Technology Market

138. The Reduced Qwerty Technology market includes not only technology for reduced hardware Qwerty devices but also reduced Qwerty applications for use on touch devices.

139.   As noted above at p. 43 n.15, and at paragraphs 87, 105, 128 and 133, competing manufacturers would rather pay royalties to RIM to license SureType rather than trying to develop reduced technologies to compete for sales or challenge SureType's hegemony as the prevailing reduced Qwerty design for hardware keyboards, a circumstance that confirms that SureType is already permanently locked in as the reduced Qwerty standard.

140.   The lock in of SureType as the standard reduced Qwerty technology is evidenced by the fact that, despite its inherent flaws, HTC, Samsung and Nokia utilize SureType (thereby incurring the cost of paying licensing fees to RIM) rather than other, better reduced Qwerty technologies which they could easily develop for themselves.   Also, reflecting SureType's status as the "locked in" reduced Qwerty standard is the fact that the term "SureType" became a synecdoche (a generic trademark, like the term "band-aid" for "adhesive strip").  The SureType "brand name" thus imposes substantial barriers to entry.

141.   RIM's dominance of the Reduced Qwerty Smartphone market caused a lock in of one of the most flawed aspects of SureType:   the mapping of alphabetic characters to the keys. One example of the flaw in SureType's letter to key configuration is the assignment of the "U" character and the "I" character to the same key.   The presence of two vowels on a single key means that many more textonyms or collisions -- different words generated by the same key sequence -- than if the two vowels were on separate keys.  (A small sample of the numerous collisions caused by this flaw in SureType follows: "is" and "us," "pit" and "put," "dine" and "dune," "pin" and "pun," "sin" and "sun," "bid" and "bud," "ride" and "rude," *etc.*  )  This flaw is compounded by preference -- particularly among teens and in text messaging -- for using the letter "u" as an abbreviation for the personal pronoun "you."  Using this abbreviation with SureType is essentially impossible since SureType's assignment of the "u" and the "i" to the

same key SureType makes two extremely common personal pronouns -- "u" [for "you"] and "I" -- collide with  each other, a problem which has frustrated numerous SureType users and, as explained below, made it impossible for RIM to design a reliable fix.

142.  Lock-in of SureType as the reduced Qwerty standard is revealed by a review of the demand for a virtual reduced Qwerty technology for Android devices and the developer response tot that demand.   After the introduction of Android devices, users began to demand alternatives to the standard virtual full Qwerty keyboard on Android touch devices.  Because of the lock-in and dominance of SureType, and its status as a synecdoche for reduced Qwerty technology, the demand for alternative virtual Qwerty keyboards took the form of a clamor for "SureType." The following comments appearing on various Android and BlackBerry internet discussions forums are illustrative:

| | |
|---|---|
| Does the droid have suretype or anything like that? Or is there an app you can download to make it suretype? If so, where would I get the app? | http://forums.crackberry.com/f169/does-droid-have-suretype-anything-like-366385/ |
| Thread:  Is it possible to get HTC 2 letters per key keyboard on 1.5? Comment: Yes, you guys are talking about compact qwerty. I like this method when I had the diamond. Very quick, and was similar to my BB pearl. | http://forum.xda-developers.com/archive/index.php/t-512460.html |
| can any recommend a suretype like keyboard? - BlackBerry Forums at ...     Jan 18, 2011 ... I've only had my DX for a couple of days, so i'm a newb to android. I've seen a lot of keyboards in the market but have no idea which one is | http://www.blackberrygames.info/article/can-any-recommend-a-suretype-like-keyboard.html |

| | |
|---|---|
| If you get the app better keyboard from the market it has a suretype like layout but not as good in my opinion. I have found that using the htc keyboard has made a difference but im still nowhere near as fast as i was with my suretype. | http://www.droidforums.net/forum/droid-hacks/36061-droid-virtual-keyboard.html |
| Smart Keyboard Pro has this function.. "compact" keyboard. It's not exactly the same I don't believe but it's similar with the two letter per button layout =] | http://www.droidforums.net/forum/droid-hacks/36061-droid-virtual-keyboard.html |
| If you get the app better keyboard from the market it has a suretype like layout but not as good in my opinion. I have found that using the htc keyboard has made a difference but im still nowhere near as fast as i was with my suretype. | http://www.droidforums.net/forum/droid-hacks/36061-droid-virtual-keyboard.html |
| Smart Keyboard Pro has this function.. "compact" keyboard. It's not exactly the same I don't believe but it's similar with the two letter per button layout =] | http://www.droidforums.net/forum/droid-hacks/36061-droid-virtual-keyboard.html |

143. Virtual keypad developers responded predictably to this demand for "SureType." As a result, five of the six reduced Qwerty virtual keypads that may be downloaded for use on Android devices, six have the same letter-to-key assignments as SureType. These are: (a) Smart Keyboard Pro by Dexilog, LLC; (b) Better Keyboard 8.0 by Better Android Apps; (d) Ultra Keyboard 3.0 by Binary Bulge Software, (c) HTC Compact Qwerty by HTC_IME; (f) Touch Pal by Cootek; and (d) Huawei's reduced Qwerty application.

144.  By contrast, only one virtual reduced Qwerty keyboard is available to be downloaded from the Android application store altered the letter to key assignments established by SureType:  *i.e.,* the Mobile Keyboard by Keypurr Technologies, Inc.  (Eatoni has developed iPhone applications in which its keypad technologies can be embedded. Several of Eatoni's virtual technologies are reduced Qwerty which correct and improve upon the SureType letter to

key assignments.)  The Android keyboard applications which replicated the SureType letter to key assignments -- *i.e.*, Smart Keyboard, Better Keyboard, Ultra Keyboard, HTC Compact Qwerty and Cootek Touch Pal -- are far better known and in far greater use than the Keypurr Mobile Keyboard.  Replication of the SureType letter- to-key assignments by virtual reduced Qwerty keyboard developers shows the lock-in of SureType as the reduced Qwerty standard -- despite its inherent flaws and the existence of superior designs -- and the network effects synonymous with monopoly power and "tipping" associated with a monopoly of the installed base of potential users.  Due to the lock-in of SureType, manufacturers and consumers have ignored numerous improvements and potential improvements in reduced Qwerty technology.

### (vi)   RIM's Reduced Qwerty Technology Demand Monopsony

145.    The Sherman Act prevents anti-competitive conduct by firms which possess a demand monopoly or a "monopsony."  (A "monopsony" is defined as market that is dominated by a single buyer.)  RIM is the sole firm with any substantial demand for reduced Qwerty technologies, since its SureType devices represent at least 90 percent of the smartphones with hardware reduced Qwerty keypads (with the remaining 10 percent share belonging to manufacturers which license SureType from RIM).   Because the only touch devices with pre-installed virtual reduced Qwerty devices are RIM's own BlackBerry Storm (which uses a virtual version of SureType) and HTC devices (which, on information and belief, licenses virtual SureType from RIM), RIM unilaterally controls the demand for reduced QWERTY technology.

### (vii) The Keyboard Innovation Market

146. The Keyboard Innovation Market consists of the firms which participate, participated, or could have participated in research and development of future innovations in the Smartphone keyboard technology markets.

147.  RIM has monopoly power in the Keyboard Innovations Market.  There are only two successfully commercialized innovations in hardware keyboard technology:  (i) RIM's patented full Qwerty technology (the '588 patents and related patents described above at paragraph 104) and (ii) SureType.  RIM's monopoly and market power in the keyboards innovations market is confirmed by the fact that  rival manufacturers -- the firms which have the carrier relationships, marketing budgets and brand recognition -- necessary to commercialize competing keypad technologies have not done so and, instead, have chosen to license RIM's full Qwerty and reduced Qwerty technologies.  Specifically, as detailed above, Palm licensed RIM's patented full Qwerty technology which was included on the Treo.   HTC, Samsung and Nokia have included SureType on various reduced Qwerty devices, with HTC definitely licensing SureType from RIM and Samsung and Nokia apparently doing so.

148.  RIM's monopoly of the Keyboard Technology Innovation markets is also confirmed by the large number of patents it has obtained relating to both full Qwerty keyboard technology and reduced Qwerty keyboard technology.  For example:

(a) Eatoni's '317 patent is an early, broad and prescient patent concerning reduced Qwerty technology.  Of the 34 subsequent patents which cite the '317 patent, RIM is the assignee of 11, and no other patentee holds more than five patents which reference the '317 patent.  Among the RIM patents citing Eatoni's '317 patent are patents for SureType, *i.e.*, US7083342 and US7819598.

- and -

(b)   Motorola's Des. 386,497 patent ("Selective Call Receiver") is an early, broad and prescient patent concerning full Qwerty technology for handheld devices.  Of the 91 patents citing Motorola's 386,497 patent, *60* were issued to Research in Motion.   In striking contrast, Nokia had only five patents which referenced the Motorola 386,497 patent; and Motorola itself had only seven patents which cited its own 386,497 patent.

Based on its patent filings alone, RIM has attempted to and succeeded in monopolizing

the hand held keyboard innovation market.

149.   The decision by RIM's rival manufacturers to forego any effort at attempting to compete with either RIM's patented full Qwerty technology or with SureType and to instead simply license those technologies from RIM confirms that RIM's patented full Qwerty technology and SureType are the prevailing hardware Qwerty technologies and that RIM has been the only successful innovator in hardware Qwerty keyboards for smartphones.

150.   The decision by rival manufacturers to license RIM's hardware keyboard technologies rather designing and commercialize competing technologies confirms the "lock-in" and "network effects" stemming from RIM's patented full Qwerty and SureType designs and the existence of prohibitively high barriers to entry in the Keyboard Innovations Market.

## IX. CLAIMS FOR RELIEF

### First Claim:

### Monopolization in Violation of §2 of the Sherman Act (15 U.S.C. §2): Maintaining Monopolies in the Hardware Qwerty Smartphone Market and Portrait Hardware Qwerty Smartphone Market by means of Patent Infringement, Refusal to Deal and Sham and Deceptive Conduct

151.   Paragraphs 1 - 150 are repeated and realleged as if set forth fully herein.

152.   Section 2 of the Sherman Act condemns persons "who monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of trade or commerce."  Section 4 of the Clayton Act permits parties injured by violations of the antitrust laws to recover treble damages.

153.   From 2002 to 2005 RIM had a 100 percent monopoly power in the "Hardware Qwerty Smartphone Market" and "Portrait Hardware Qwerty Smartphone Market" for reduced QWERTY technology.  As of 2005, the RIM products in these markets included both its full

Qwerty and reduced Qwerty (SureType) products.

154.  Prior to 2005, RIM was aware of Eatoni's pending application for the '317 patent and, in fact, at least one of RIM's patent filings regarding SureType referred to Eatoni's then pending '317 patent.

155.  RIM knew that Eatoni's '317 patent represented a threat to its monopoly in the Hardware Qwerty and Portrait Hardware Qwerty Smartphone Markets.  RIM had been vexed by the conflicting objectives of increasing the size of the keys on its BlackBerry devices and reducing the size of the device and feared that the solutions covered in Eatoni's patent -- if practiced either by Eatoni or a licensee -- would solve this key engineering challenge facing the handheld industry and result in keyboards that were a dramatic improvement over RIM's full Qwerty keyboards.

156.   RIM therefore decided to infringe Eatoni's patent by developing and commercializing SureType. In doing so, RIM increased the size of the consumer segment which used BlackBerry devices.  RIM's SureType products -- the Charm and the Pearl -- were enormously successful and appealed to prosumers, women and teenagers -- a different market segment than the enterprise class who were the primary purchasers of the traditional full Qwerty BlackBerry devices.  RIM has admitted that by introducing its SureType products it doubled its smartphone sales.

157.  In this fashion, RIM's patent infringement extended its monopoly in the Hardware Qwerty Smartphone market and Portrait Hardware Qwerty Smartphone market.  RIM's maintenance and preservation of its monopolies in the Hardware Qwerty Smartphone Market and   Portrait Hardware Qwerty Smartphone Market was not achieved because of RIM's foresight, skill, industry or luck, but instead by its infringement of Eatoni's '317 patent. Section

65

2 of the Sherman Act is violated where a firm achieves or maintains a monopoly by committing an independent business tort.   Patent infringement is a statutory business tort.

158.  When Eatoni's '317 patent was issued in 2005, Eatoni, as patentee, had a right under the patent  laws to enjoin RIM's SureType device sales.  Eatoni also possessed claims for at least hundreds of millions of dollars for prior infringement against RIM. Eatoni's patent infringement claims thus represented a direct threat to RIM's monopoly and market share of the Hardware Qwerty and Portrait Hardware Qwerty Smartphone markets and its financial well-being.

159.  RIM then entered into the mediation term sheet with Eatoni which expressly required RIM to negotiate joint development terms with Eatoni in good faith and, thereafter, collaborate with Eatoni in the development of an improvement of SureType (defined in the term sheet as "SureType II") and commercialize the new technology by including it one of RIM's smartphone products.

160.  Thereafter, in violation of section 2 of the Sherman Act, RIM maintained its monopolies in the Hardware Qwerty Smartphone market and the Portrait Hardware Qwerty Smartphone Market by, as alleged herein, refusing to deal with Eatoni and engaging in misrepresentations, deceptions, sham conduct and monopolistic patterns and practices, including (but not limited to) the following conduct:

(a) As arbitrator Davidson found in his 2007 Award, RIM refused to negotiate joint development terms in good faith and, instead, wrongly and contrary to its obligations under the term sheet, insisted that the joint work would include hardware only to exclusion of software and that it have complete discretion over whether or not to commercialize any new technology.

(b) As arbitrator Davidson found, RIM prevented the completion of a joint development agreement by wrongfully insisting on limiting the joint work to hardware innovation and wrongfully insisting on complete discretion to determine

whether or not to commercialize any new jointly designed technology.

(c) RIM's officers falsely testified in the 2007 arbitration that RIM intended to "test in the market" any faster and more accurate new keyboard technology which it designed jointly with Eatoni before deciding not to commercialize it, especially if the new technology maintained Qwerty letter ordering.

- and -

(d) After being ordered by arbitrator Davidson to collaborate in the joint work with Eatoni contemplated under the term sheet, RIM entirely misled Eatoni and engaged in sham conduct in the following fashion:

(i) RIM represented to Eatoni that it was interested in commercializing a design involving multidirectional keys which it referred to as "the Tripod," when, in fact, as RIM officer Carlo Chiarello admitted, RIM actually had no interest whatsoever in commercializing a device with multidirectional keys.

(ii) RIM represented that it was interested in commercializing the tripod design even though, in RIM's own view, the Tripod was only suitable for one of the three principal form factors -- the flip phone -- and would not work well with the candy bar or slider form factors.  In fact, as Carlo Chiarello admitted, RIM actually had no interest in any keyboard design which, in RIM's own view, did not work well across all three form factors.

(iii) RIM represented to Eatoni that if a Tripod design was successfully developed it could possibly be chosen as the keypad for the first-ever BlackBerry flip phone. In fact, as arbitrator Davidson found, unbeknownst to Eatoni, just before the joint work had been commenced, RIM agreed with T-Mobile to use the existing version of SureType on the first ever BlackBerry flip.

(iv) RIM refused to permit Eatoni to work on improving SureType software. RIM's refusal violated the ruling in the 2007 award that the joint work necessarily included software improvement and the provision in the Term Sheet which provided that, if an alternative or improvement over SureType software was achieved in the joint work, such software, at minimum, would be included in an "inactive" form in RIM products with Eatoni receiving activation fees paid by purchasers who wished to use it. RIM refused to permit Eatoni to work on software improvements even though one of its software developers, Vadim Fux, acknowledged Eatoni's leadership in disambiguation software design in an email dated November 21, 2007 and in his arbitration testimony and even though RIM's CEO Lazaridis and top marketing executive Mike McAndrews were extremely frustrated with the performance of SureType software, as they

made clear in RIM internal emails.

(v) RIM refused to commercialize the tripod design or even test it the market, despite the fact that, as RIM admits, it was faster and more accurate than the existing version of SureType and met RIM's goal of maintaining Qwerty letter ordering.  RIM refused to test the Tripod in the market, even though RIM had represented in the 2007 arbitration that it would do so.

(vi) RIM abandoned the joint work on January 15, 2008,     when it proposed assigning its intellectual property rights concerning the Tripod design to Eatoni in consideration for a release from its obligations under the term sheet and 2007 arbitration award.

(vii) RIM offered only obviously false and pretextual reasons for rejecting any plan to commercialize the Tripod design, as set forth above in above in paragraph 70.  By providing only false and pretextual reasons for its rejection of the Tripod, RIM made it impossible for Eatoni to take any further steps toward a design which might have RIM might have considered commercializing.

- and -

(viii) RIM refused to consider the possibility of simultaneously distributing the Tripod design and the existing version of SureType even though such simultaneous distribution was expressly contemplated by the term sheet. Chiarello testified that RIM did not consider -- and could not have even considered -- such simultaneous distribution of the two technologies because that would have created what Chiarello called "market confusion" and, as Chiarello also testified, undermined RIM's "multi-year investment" in the existing version of SureType. This is a direct admission that RIM's motive was to protect its monopoly over reduced Qwerty technology and its monopoly and market share of hardware Qwerty, portrait hardware Qwerty and reduced Qwerty devices, and related technology markets, and that RIM acted with specific intent in doing so.

161.   Eatoni has been injured in its business and property by RIM's exclusionary

conduct, as alleged herein.

162.   Consumers have also been injured by RIM's exclusionary conduct, as alleged

herein.

**Second Claim:**

**Monopolization in Violation of §2 of the Sherman Act (15 U.S.C. §2):
Establishing and Maintaining Monopolies in the Reduced Qwerty Smartphone
Market and Prosumer Smartphone Market by Means of Patent
Infringement and Refusal to Deal and Sham and Deceptive Conduct**

163.   Paragraphs 1 - 162 are repeated and realleged as if set forth fully herein.

164.   RIM infringed Eatoni's '317 patent by developing and commercializing SureType. In doing so, RIM increased the size of the market segment which used BlackBerry devices. RIM's SureType products -- the Charm and the Pearl -- were  enormously successful and appealed to prosumers, women and teenagers -- an entirely different market segment than the enterprise class who were the primary purchasers or the traditional full Qwerty BlackBerry devices.   RIM's monopolies in the Reduced Qwerty Smartphones and Prosumer Smartphones markets were not achieved because of RIM's foresight, skill, industry or luck, but because of its infringement of Eatoni's '317 patent.  Section 2 of the Sherman Act is violated where a firm achieves or maintains a monopoly by committing an independent business tort.   Patent infringement is a statutory business tort.

165.  After Eatoni's '317 patent was issued in 2005, RIM entered into the Term Sheet which expressly required RIM to negotiate joint development terms with Eatoni in good faith and, thereafter, collaborate with Eatoni in the development of SureType and commercialize the resulting new technology by including it in RIM's smartphone products.

166.  Thereafter, in violation of section 2 of the Sherman Act, RIM maintained its monopolies in the Reduced Qwerty Smartphones Market and the Prosumer Smartphones Market by, as alleged in this complaint, refusing to deal with Eatoni and engaging in misrepresentations, deceptions, sham conduct and monopolistic patterns and practices, including (but not limited) to

the conduct set forth above in paragraph 160.

167.  Eatoni has been injured in its business and property by RIM's exclusionary

conduct, as alleged herein.

168.  Consumers have also been injured by RIM's exclusionary conduct, as alleged

herein.

**Third Claim:**

**Monopolization in Violation of §2 of the Sherman Act (15 U.S.C. §2):**
**Maintaining a Monopoly in the Hardware Qwerty Technology Market**

169.  Paragraphs 1 - 168 are repeated and realleged as if set forth fully herein.

170.  From 2002 to 2005 RIM had 100 percent monopoly power in the "Hardware

Qwerty Technology market" consisting of RIM's patented full Qwerty technology (described

above in paragraph 104 ).

171.  Prior to 2004, RIM was aware of Eatoni's pending application for the '317 patent

and, in fact, at least one of RIM's patent filings regarding SureType referred to Eatoni's then-

pending '317 patent.

172.  RIM knew that Eatoni's '317 patent represented a threat to its monopoly in the

Hardware Qwerty Technology market.  RIM had been vexed with the conflicting objectives of

increasing the size of the keys on its BlackBerry devices and reducing the size of the devices.

RIM realized that the solutions covered in Eatoni's patent -- if practiced either by Eatoni or a

licensee --  would solve this key engineering challenge, and result in keyboard technology that

was a dramatic improvement over RIM's patented full Qwerty technology and possibly displace

RIM's full Qwerty technology entirely and become a new standard.

173.   RIM therefore decided to infringe Eatoni's patent by developing and

commercializing SureType.  In doing so, RIM increased the size of the consumer segment which used BlackBerry devices.  RIM's SureType products -- the Charm and the Pearl -- were enormously successful and appealed to prosumers, women and teenagers, an entirely different segment market than the enterprise class who were the primary purchasers or the traditional full Qwerty BlackBerry devices.  RIM has admitted that by introducing its SureType products it doubled its smartphone sales.

174.  By adding the infringing SureType technology to its portfolio of keyboard technologies, RIM's patent infringement extended RIM's monopoly of the Hardware Qwerty Technology market.  RIM's maintenance and preservation of its monopoly in the Hardware Qwerty Technology market in this manner was not achieved because of RIM's foresight, skill, industry or luck, but instead by infringing Eatoni's '317 patent.  Section 2 of the Sherman Act is violated where a firm achieves or maintains a monopoly by committing an independent business tort.   Patent infringement is a statutory business tort.

175.  When Eatoni's '317 patent was issued in 2005, Eatoni, as patentee, had a right under the patent infringement laws to enjoin RIM's SureType sales and Eatoni also possessed claims for at least hundreds of millions of dollars for RIM's prior infringement.  Eatoni's patent infringement claims thus represented a direct threat to RIM's monopoly and market share of the Hardware Qwerty Technology market.

176.  RIM entered into the Term Sheet which expressly required RIM to negotiate a joint development agreement with Eatoni in good faith and, thereafter, collaborate with Eatoni in the development of an improvement to of SureType (defined in the term sheet as "SureType II") and commercialize the new technology by including it in RIM smartphone products.

177.  In violation of section 2 of the Sherman Act, RIM maintained its monopolies in the

Hardware Qwerty Technology market and destroyed competition in the Hardware Qwerty Technology market, as alleged in this complaint, by refusing to deal with Eatoni and engaging in misrepresentations, deceptions, sham conduct and monopolistic patterns and practices, including (but not limited) to the conduct set forth above in paragraph 160.

178.  Additionally, RIM's smartphones are an essential facility for the commercialization of any new keyboard innovation or technologies.

179.  Furthermore, Eatoni specifically bargained for the right to use RIM's smartphone products as a platform for the introduction of new keyboard hardware and software technologies to the market.

180.  Eatoni has been injured in its business and property by RIM's exclusionary conduct, as alleged herein.

181.  Consumers have also been injured by RIM's exclusionary conduct, as alleged herein.

**Fourth Claim:**

**Monopolization in Violation of §2 of the Sherman Act (15 U.S.C. §2): Obtaining and Maintaining a Monopoly in the Reduced Qwerty Technology Market**

182.  Paragraphs 1 - 181 are repeated and realleged as if set forth fully herein.

183.  RIM infringed Eatoni's '317 patent by developing and commercializing SureType. In doing so, RIM increase the size of the market segment which used BlackBerry devices. RIM's SureType products -- the Charm and the Pearl -- were  enormously successful and appealed to prosumers, women and teenagers --  an entirely different market segment than the enterprise class who were the primary purchasers or the traditional full Qwerty BlackBerry devices, and enabled SureType to achieve a 100 percent monopoly in the reduced Qwerty

technology market.  RIM's monopoly in the reduced Qwerty technology market was not achieved because of RIM's foresight, skill, industry or luck, but because of its infringement of Eatoni's '317 patent.  Section 2 of the Sherman Act is violated where a firm achieves or maintains a monopoly by committing an independent business tort.   Patent infringement is a statutory business tort.

184.  After Eatoni's '317 patent was issued in 2005, RIM entered into the mediation term sheet which expressly required RIM to negotiate joint development terms with Eatoni in good faith and, thereafter, collaborate with Eatoni in the development of an improvement of SureType (defined in the term sheet as "SureType II") and commercialize the new technology by utilizing it in RIM's smartphone products.

185.  In violation of section 2 of the Sherman Act, RIM maintained its monopoly in the reduced Qwerty Technology market and destroyed competition in the reduced Qwerty technology market by, as alleged in this complaint, refusing to deal with Eatoni and engaging in misrepresentations, deceptions, sham conduct and monopolistic patterns and practices, including (but not limited) to the conduct set forth above in paragraph 160.

186.  Additionally, RIM's smartphones are an essential facility for the commercialization of any new keyboard technologies or innovations.

187.   Furthermore, Eatoni specifically bargained for the right to use  RIM smartphone products as a platform for the introduction of new keyboard hardware and software technologies to the market.

188.  Eatoni has been injured in its business and property by RIM's exclusionary conduct, as alleged herein.

189.   Consumers have also been injured by RIM's exclusionary conduct, as alleged

herein.

## Fifth Claim:

## Monopolization in Violation of §2 of the Sherman Act (15 U.S.C. §2): RIM's Establishment, Abuse and Maintenance of its Reduced Qwerty Monopsony

190.   Paragraphs 1 - 189 are repeated and realleged as if set forth fully herein.  As the manufacturer of the Pearl reduced Qwerty device and licensor of SureType, RIM entirely dominates the demand market consisting of the buyers of  reduced Qwerty technology and reduced Qwerty innovations. Section 2 of the Sherman Act governs the conduct of demand monopolists (monopsonists) in the same fashion it applies to the conduct of firms that monopolize sellers' markets.

191.   RIM infringed Eatoni's '317 patent by developing and commercializing SureType in order to increase the size of the market segment which used BlackBerry devices.  RIM's SureType products -- the Charm and the Pearl -- were  enormously successful and enabled SureType to become a 100 percent monopsonist (*i.e.*, monopolist of the demand) for reduced Qwerty technology and reduced Qwerty innovations.  This monopsony was not achieved because of RIM's foresight, skill, industry or luck, but because of its infringement of Eatoni's '317 patent.  Section 2 of the Sherman Act is violated where a firm achieves or maintains a monopoly (including a demand monopoly or monopsony) by committing an independent business tort. Patent infringement is a statutory business tort.

192.   In violation of section 2 of the Sherman Act, RIM abused its status as a monopsonist of the demand market consisting of the buyers of reduced Qwerty technology and reduced Qwerty innovation -- and destroyed competition in the reduced Qwerty technology market and keyboard technology innovations market -- by, as alleged in this complaint, refusing

to deal with Eatoni and engaging in misrepresentations, deceptions, sham conduct and monopolistic patterns and practices, including (but not limited) to the conduct set forth above in paragraph 160.

193.  Additionally, RIM's smartphones are an essential facility for the commercialization of any new keyboard technologies or innovations.

194.   Furthermore, Eatoni specifically bargained for the right to use RIM's smartphone products as a platform for the introduction of new keyboard hardware and software technologies to the market.

195.  Eatoni has been injured in its business and property by RIM's exclusionary conduct, as alleged herein.

196.   Consumers have also been injured by RIM's exclusionary conduct, as alleged herein.

### Sixth Claim:

### Monopolization in Violation of §2 of the Sherman Act (15 U.S.C. §2): RIM's Maintenance of its Monopoly in the Keyboard Technology Innovations Market and Suppression of Innovation in Keyboard Technology

197.  Paragraphs 1 - 196 are repeated and realleged as if set forth fully herein.

198.   From 2002 to 2004, RIM's patented full Qwerty technology -- as defined in paragraph 104 -- was the only keyboard innovation in the mobile phone industry, which was otherwise entirely dominated by the traditional telephone keypad.  From 2002 to the present, RIM has also dominated the patenting in the broad area of keyboard innovation for Qwerty keyboards, as reflected by the large number of RIM patents citing Motorola's early, broad and prescient patent Des. 386,497 concerning Qwerty keyboards for handheld devices and Eatoni's '317 patent.  By adding the infringing SureType technology to its portfolio of keyboard

innovations, RIM maintained and extended its monopoly of the keyboard technology innovations market.  RIM's maintenance and preservation of its monopoly in the keyboard innovations market in this fashion was not achieved because of RIM's foresight, skill, industry or luck, but instead because of its infringement of Eatoni's '317 patent. Section 2 of the Sherman Act is violated where a firm achieves or maintains a monopoly by committing an independent business tort.  Patent infringement is a statutory business tort.

      199.  In violation of section 2 of the Sherman Act, RIM maintained its monopoly in the keyboards innovations market and suppressed innovation in keyboard technologies by, as alleged in this complaint, refusing to deal with Eatoni and engaging in misrepresentations, deceptions, sham conduct and monopolistic patterns and practices, including (but not limited) to the conduct set forth above in paragraph 160.

      200.  RIM's extraordinary accumulation of patents concerning keyboard hardware and software also is a monopolization of patents and a monopolization of the keyboard technology innovation market in violation of section 2 of the Sherman Act.

      201.  Additionally, RIM's smartphones are an essential facility for the commercialization of any new keyboard innovation.

      202.   Furthermore, Eatoni specifically bargained for the right to use RIM's smartphone products as a platform for the introduction of new keyboard  innovations to the market.

      203.  Eatoni has been injured in its business and property by RIM's exclusionary conduct, as alleged herein.

      204.   Consumers have also been injured by RIM's exclusionary conduct, as alleged herein.

**Seventh Claim:**

**Violation of §340 of the New York General Business Law**

205.  Paragraphs 1- 204 are repeated and realleged as if set forth fully herein.

206.  Section 340(1) of the New York General Business Law (the Donnelly Act) provides that:

> Every contract, agreement, arrangement or combination whereby a monopoly in the conduct of any business, trade or commerce or in the furnishing of any service in this state, is or may be established or maintained, . . . or whereby for the purpose of establishing or maintaining any such monopoly . . . any service in this state any business, trade or commerce or the  furnishing of any service is or may be restrained, is hereby declared to be against public policy, illegal and void.

207.  RIM's conduct has occurred in, and is having a substantial effect upon commerce within the State of New York.

208.  RIM violated the Donnelly Act, as alleged in this complaint, by infringing and/or maintaining the monopolies described herein by the infringement of Eatoni's '317 patent, refusing to deal with Eatoni and engaging in misrepresentations, deceptions, sham conduct and monopolistic patterns and practices, including (but not limited) to the conduct set forth above in 160.

209.  There has been no legitimate business purpose behind RIM's conduct.

210.   Eatoni is entitled to recover treble damages under §§340(1) and 340(5) of the New York General Business Law.

**Eighth Claim:**

**Injunctive Relief Under  §2 of the Sherman Act and
     and §16 of the Clayton Act, 15 U.S.C. §26     **

211. Paragraphs 1- 210 are repeated and realleged as if set forth fully herein.  Section 16

of the Clayton Act states that:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws ... when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings.

212.  Eatoni's injury cannot be fully compensated by money damages.

213.  In the event that the Court determines that Eatoni cannot be fully compensated by money damages, or will suffer an irreparable, permanent or ongoing injury without injunctive and or equitable relief, the Court should order injunctive and/or equitable relief designed to make Eatoni whole.

## X.  **JURY DEMAND**

214.  Eatoni demands a jury trial of all issues so triable.

## XI.  **RELIEF DEMANDED**

WHEREFORE, Eatoni demands judgment as follows:

1.  On each of the First through Seventh Claims, money damages in an amount to be determined at trial but in any event no less than $900 million, trebled pursuant to §4 of the Clayton Act, 15 U.S.C. §15.

2.  On the Eighth Claim, any injunction necessary to make Eatoni whole and within this Court's power to fashion equitable and injunctive remedies.

- and -

3.  Interest, costs and attorneys' fees as allowable by law.

Dated:  New York, New York
        June 7, 2011

Berry Law pllc

By: _____
     Eric Berry [EB8598]
*Attorneys for plaintiff Eatoni*
     *Ergonomics, Inc.*
132 Nassau Street, Suite 1300
New York, New York   10038
(212) 355-0777

Case No.  10079                          Year 2008
Civil Action                             Judge Pauley

EATONI ERGONOMICS, INC.,

                    Plaintiff,

 - against -

RESEARCH IN MOTION CORP.  and
RESEARCH IN MOTION LIMITED,

                    Defendants.

## AMENDED COMPLAINT

BERRY LAW PLLC
*Attorneys for plaintiff*
*Eatoni Ergonomics, Inc.*
132 NASSAU STREET, SUITE 1300
NEW YORK, NEW YORK  10038
(212) 355-0777